11-3333-cv
Marvel Characters, Inc. v. Kirby

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: October 24, 2012        Decided: August 8, 2013)

Docket No. 11-3333-cv

-------------------------------------

MARVEL CHARACTERS, INCORPORATED, MARVEL WORLDWIDE, INCORPORATED, MVL RIGHTS, LLC,

Plaintiffs-Counter-Defendants-Appellees,

WALT DISNEY COMPANY, MARVEL ENTERTAINMENT, INCORPORATED,

Counter-Defendants-Appellees,

- v -

LISA R. KIRBY, NEAL L. KIRBY, SUSAN N. KIRBY, BARBARA J. KIRBY,

Defendants-Counter-Claimants-Appellants.

-------------------------------------

Before: CABRANES, SACK, and CARNEY, Circuit Judges.

Appeal by the defendants-counter-claimants from a judgment of the United States District Court for the Southern District of New York (Colleen McMahon, Judge) granting summary judgment in favor of the plaintiffs-counter-defendants on their claim for declaratory relief and denying the defendants-counter-claimants' cross-motion for summary judgment. Plaintiffs-counter-defendants commenced

this lawsuit in response to notices sent by the defendants-counter-claimants, the children of comic book artist Jack Kirby, purporting to terminate alleged assignments in certain of their father's works pursuant to section 304(c)(2) of the Copyright Act of 1976. We conclude that: (1) the district court incorrectly determined that it had personal jurisdiction over Lisa and Neal Kirby; (2) Lisa and Neal Kirby were not indispensable parties to the action under Rule 19(b) of the Federal Rules of Civil Procedure; and (3) the district court correctly determined that the works at issue were "made for hire" under section 304(c), and that Marvel was therefore entitled to summary judgment.

Affirmed in part; vacated in part.

R. BRUCE RICH (James W. Quinn, Randi W. Singer, Gregory Silbert, on the brief), Weil, Gotshal & Manges LLP, New York, New York; David Fleischer, Haynes and Boone, LLP, New York, New York for Plaintiffs-Counter-Defendants-Appellees and Counter-Defendants-Appellees.

MARC TOBEROFF, Toberoff & Associates, P.C., Malibu, California, for Defendants-Counter-Claimants-Appellants.

SACK, Circuit Judge:

This appeal requires us to revisit our case law applying the work-for-hire doctrine in the context of section 304 of the Copyright Act of 1976 (or, the "1976

Act"), 17 U.S.C. § 304. Defendants-counter-claimants-appellants Lisa, Neal, Susan, and Barbara Kirby (collectively, the "Kirbys") are the children of the late Jack Kirby. Kirby is considered one of the most influential comic book artists of all time. At various times throughout his career, he produced drawings for Marvel Comics, a comic book publisher that has since grown into the multifaceted enterprise reflected in the case caption: Marvel Characters, Inc., Marvel Worldwide, Inc., MVL Rights, LLC, and Marvel Entertainment, Inc. (collectively, "Marvel"). At issue here are the rights to drawings Kirby allegedly created between 1958 and 1963.

The Kirbys appeal from the district court's grant of summary judgment to Marvel, which was based on the conclusion that all of the works at issue are "works made for hire" within the meaning of section 304(c), and that the Kirbys therefore have no rights to the works. Two of the Kirbys, Lisa and Neal, also challenge the district court's conclusion that it had personal jurisdiction over them under New York's long-arm statute. They further argue that they are indispensable parties under Rule 19(b) of the Federal Rules of Civil Procedure, such that their absence from this lawsuit (by virtue of the district court's lack of personal

jurisdiction over them) requires that the suit be dismissed in its entirety.

We conclude that the district court was without personal jurisdiction over Lisa and Neal. We therefore vacate the judgment as against them. We also find, however, that Lisa and Neal are not indispensable parties to this lawsuit, and that the district court was correct in concluding that the works at issue are "works made for hire" under section 304(c). We therefore affirm the judgment as to defendants Barbara and Susan.

**BACKGROUND**

In this appeal from the grant of summary judgment, we view the evidence in the light most favorable to the nonmovants, the Kirbys for present purposes, and draw all reasonable inferences in their favor. See, e.g., Singer v. Ferro, 711 F.3d 334, 339 (2d Cir. 2013).

Jack Kirby

Jack Kirby, born Jacob Kurtzberg in New York City's Lower East Side in 1917, began his career in the comic book business in the late 1930s. In the summer of 1940, a young woman named Rosalind moved into the apartment above his with her family. The day they met, Kirby asked Rosalind if she "[w]ould like to see [his] etchings[.]" She thought he wanted "to fool around"; he only wanted to show

4

her his drawings for a new comic book series called <u>Captain America</u>. John Morrow, <u>"Would You Like to See My Etchings?":</u> <u>Rosalind Kirby Interviewed</u> (conducted Dec. 12, 1995), THE JACK KIRBY COLLECTOR, April 1996, at 6. Kirby and "Roz" were married in 1942. After Kirby's military service in World War II, the couple had four children: Susan, Neal, Barbara, and Lisa.

Kirby's career in comic book illustration spanned more than half a century. His influence was substantial. An obituary marking his death in 1994 quoted Joe Simon, Kirby's creative partner for fifteen years: "He brought the action drawing to a new level. His style was imitated all over and still is today to a certain extent." <u>Jack Kirby,</u> <u>76; Created Comic Book Superheroes</u>, N.Y. TIMES, Feb. 8, 1994, at D22.

Kirby was prolific, too. In 1951 alone, 308 pages of Kirby's work appeared in published comic books. This output was typical for him in the years between 1940 and 1978.

<u>Marvel Comics and Stan Lee</u>

Marvel was founded as Timely Comics in 1939 by one Martin Goodman. In 1940, Marvel purchased the first ten issues of <u>Captain America</u> from Kirby and Joe Simon. But

5

Kirby and Simon would soon move on to a competitor, DC Comics. To replace them, Goodman hired one Stanley Lieber.

Lieber would come to be known by his pen name, Stan Lee. Lee is in his own right a towering figure in the comic book world, and a central one in this case. He in effect directed Marvel from the early 1940s until sometime in the 1970s, serving, in his words, as "Editor," "Art Director" and "a staff writer." Deposition of Stan Lee ("Lee Dep."), May 13, 2010, at 17, Joint App'x at 2437. He continued to work for Marvel in one capacity or another at least to the day of his deposition testimony in this litigation.

But in the 1940s and 50s, Marvel, hobbled by poor business decisions, was hardly a success story.[1] In 1958, Kirby began producing drawings for Marvel once again. And by 1961, its fortunes began to change. That year, Marvel released the first issues of <u>The Fantastic Four</u>. On its heels were releases of the first issues of some of Marvel's

---

[1] Certainly not helping matters was a mid-1950s investigation by the United States Senate into comics' alleged corrupting influence on America's youth. On April 21, 1954, a subcommittee of the Senate Judiciary Committee held a televised hearing on the topic. Louis Menand, <u>The Horror: Congress investigates the comics</u>, THE NEW YORKER, Mar. 31, 2008, at 124. The venue was the United States Courthouse at 40 Foley Square in New York City -- named in 2001 the "Thurgood Marshall United States Courthouse" -- in which this opinion was prepared. <u>Id.</u>

most enduring and profitable titles, including The Incredible Hulk, The X-Men, and Spider-Man.

### Kirby's Relationship with Marvel from 1958-1963

This litigation concerns the property rights in 262 works published by Marvel between 1958 and 1963. Who owns these rights depends upon the nature of Kirby's arrangement with Marvel during that period.

It is undisputed that Kirby was a freelancer, i.e., he was not a formal employee of Marvel, and not paid a fixed wage or salary. He did not receive benefits, and was not reimbursed for expenses or overhead in creating his drawings. He set his own hours and worked from his home. Marvel, usually in the person of Stan Lee, was free to reject Kirby's drawings or ask him to redraft them. When Marvel accepted drawings, it would pay Kirby by check at a per-page rate.

Despite the absence of a formal employment agreement, however, the record suggests that Kirby and Marvel were closely affiliated during the relevant time period. Lee assigned Kirby, whom he considered his best artist, a steady stream of work during that period. See Lee Dep. at 36, Joint App'x at 2456 ("I wanted to use Jack for everything, but I couldn't because he was just one guy.");

7

id. at 37, Joint App'x at 2457 ("So I said: All right, forget it, Jack. I will give [the Spider-Man strip] to somebody else. Jack didn't care. He had so much to do."); id. at 30, Joint App'x 2450 ("He got the highest [rate] because I considered him our best artist.").

And Kirby seems to have done most of his work with Marvel projects in mind. Although the Kirby children assert that their father could and did produce and sell his work to other publishers during those years, lists of Kirby's works cited by both parties establish that the vast majority of his published work in that time frame was published by Marvel (or Atlas Comics, as part of Marvel Comics Group).

The specifics of Kirby and Marvel's creative relationship during this time period are less clear.

According to Lee, at the relevant time, artists worked using what the parties call the "Marvel Method." It was developed as a way to "keep a lot of artists busy" when Lee or another writer could not provide the artist with a completed script. Lee Dep. at 21, Joint App'x at 2441. The first step was for Lee to meet with an artist at a "plotting conference." Id. at 39-40, Joint App'x at 2459-60. Lee would provide the artist with a "brief outline" or "synopsis" of an issue; sometimes he would "just talk . . .

8

with the artist" about ideas.  Id. at 35, Joint App'x at 2455.  The artist would then "draw it any way they wanted to."  Id. at 21, Joint App'x at 2441.  Then a writer, such as Lee, would "put in all the dialogue and the captions."  Id.  According to Lee, he "maintain[ed] the ability to edit and make changes or reject what the other writers or artists had created."  Id. at 22, Joint App'x at 2442.

Lee testified that he worked this way with Kirby "for years":

> And Jack Kirby and I would, let's say
> when we did the Fantastic Four, I first
> wrote a synopsis of what I thought the
> Fantastic Four should be, who the
> characters should be, what their
> personalities were.  And I gave it to
> Jack, and then I told him what I thought
> the first story should be, how to open
> it, who the villain should be, and how we
> would end it.  And that was all.  Jack
> went home and drew the whole thing.  I
> put the dialogue in.

Id. at 118, Joint App'x at 2538.

Other evidence in the record, including some of Lee's own deposition testimony, indicates, however, that Kirby had a freer hand within this framework than did comparable artists.  For example, Lee explained that "instead of telling [Kirby] page by page" what to draw, Lee might simply tell him to "[d]evote five pages to this, five pages to that, and three pages to that."  Id. at 70, Joint

9

App'x at 2490.  Sometimes during plotting sessions, Kirby might "contribute something or he might say, 'Stan, let's also do this or do that.'"  Id. at 41, Joint App'x at 2461.

It is beyond dispute, moreover, that Kirby made many of the creative contributions, often thinking up and drawing characters on his own, influencing plotting, or pitching fresh ideas.

The Termination Notices

The dispute before us began in September 2009, when the Kirbys served various Marvel entities with documents entitled "Notice of Termination of Transfer Covering Extended Renewal Term" (the "Termination Notices"). The Termination Notices purport to exercise statutory termination rights under section 304(c)(2) of the Copyright Act of 1976, 17 U.S.C. § 304, with respect to 262 works in all.

Each notice states an effective date sometime in the future, presumably between 2014 and 2019.  The effective dates are calculated according to section 304(c)'s timing provision, which states in relevant part that "[t]ermination . . . may be effected at any time during a period of five years beginning at the end of fifty-six years

10

from the date copyright was originally secured . . . ."  17 U.S.C. § 304(c)(3).

### Procedural History

Marvel filed this lawsuit on January 8, 2010.  It sought a declaration that the Kirbys have no termination rights under section 304(c)(2), and that the Termination Notices are therefore ineffective.  Marvel's claim was premised on its contention that all of the works were "made for hire" by Jack Kirby for Marvel within the definition of section 304(c).

On March 9, 2010, the Kirbys filed a motion to dismiss the complaint.  Lisa and Neal Kirby, residents of California, sought dismissal on the ground that they were not subject to personal jurisdiction in New York State. (The other Kirby siblings, Susan and Barbara, are residents of New York and do not contest personal jurisdiction.)  The Kirbys also argued that Lisa and Neal are indispensable to the action under Fed. R. Civ. P. 19, and that Marvel's entire suit must therefore be dismissed as against all parties.

The district court denied the motion on April 14, 2010.  Marvel Worldwide, Inc. v. Kirby, No. 10 Civ. 141, 2010 WL 1655253, 2010 U.S. Dist. LEXIS 38701 (S.D.N.Y. Apr.

11

14, 2010). It concluded that it had personal jurisdiction over Lisa and Neal under New York's long-arm statute, and that the exercise of this jurisdiction was consistent with constitutional due process. Id. at *3-*9; 2010 U.S. Dist. LEXIS 38701, at *7-*25. It therefore did not reach the question of whether Lisa and Neal were indispensable parties.

The Kirbys answered Marvel's complaint and asserted several counterclaims of their own. Marvel moved to dismiss each of them. On November 22, 2010, the district court granted the motion as to all but the Kirbys' counterclaim seeking a declaration that the Termination Notices were valid. Marvel Worldwide, Inc. v. Kirby, 756 F. Supp. 2d 461 (S.D.N.Y. 2010).

In early 2011, after discovery was complete, the parties cross-moved for summary judgment. Marvel also moved to exclude some of the Kirbys' evidence, most notably the reports of the Kirbys' putative expert witnesses, John Morrow and Mark Evanier.

On July 28, 2011, the district court granted Marvel's motions to exclude Morrow and Evanier's testimony, and granted Marvel's motion for summary judgment. Marvel Worldwide, Inc. v. Kirby, 777 F. Supp. 2d 720 (S.D.N.Y.

12

2011).  It relied upon case law in this Circuit applying the so-called "instance and expense test" to determine whether a work is "made for hire" under section 304(c).  Id. at 738-43.  The court concluded that undisputed facts in the record establish as a matter of law that the works at issue were made at Marvel's instance and expense, and were therefore works made for hire.  Id.  This being so, the Kirbys had no termination rights, and their Termination Notices were ineffective.  The district court entered judgment accordingly on August 8, 2011.

The Kirbys appeal.

**DISCUSSION**

**I.  Personal Jurisdiction over Lisa and Neal Kirby**

We turn first to the issue of personal jurisdiction over Lisa and Neal Kirby.  Lisa and Neal are California residents.  They contend that the district court erred when it determined that New York State's long-arm statute provided a basis for jurisdiction over them in the Southern District of New York.  We review a district court's legal conclusions concerning its exercise of personal jurisdiction de novo, and its underlying factual findings for clear error.  D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 103 (2d Cir. 2006).

13

A district court must have a statutory basis for exercising personal jurisdiction. See Grand River Enterprises Six Nations, Ltd. v. Pryor, 425 F.3d 158, 165 (2d Cir. 2005). Because this is "a federal question case where a defendant resides outside the forum state, . . . [and the relevant] federal statute does not specifically provide for national service of process," PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997) (internal quotation marks omitted), we apply "the forum state's personal jurisdiction rules," id. We therefore look to New York State law.

We focus our attention on section 302(a)(1) of New York State's long-arm statute, N.Y. C.P.L.R. § 302(a)(1), upon which the district court rested its jurisdiction, and which Marvel invokes here. Section 302(a)(1) provides that "a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any business within the state . . . ." Id. We have recognized that for section 302(a)(1) to apply, "'it is essential . . . that there be some act by which the defendant purposefully avails [herself] of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" Beacon

14

*Enterprises, Inc. v. Menzies*, 715 F.2d 757, 766 (2d Cir. 1983) (alteration in original) (quoting *George Reiner and Co. v. Schwartz*, 41 N.Y.2d 648, 650, 363 N.E.2d 551, 553, 394 N.Y.S.2d 844, 846 (1977)).

Under the facts of this case, the only acts that could potentially give rise to section 302(a)(1) jurisdiction over Lisa and Neal are the sending of the Termination Notices to Marvel in New York. We conclude that this is an insufficient basis for personal jurisdiction.

In *Beacon Enterprises*, *supra*, we applied section 302(a)(1) in a declaratory judgment suit very similar to this one. The defendant there, Mary Menzies, thought that the plaintiff, Beacon, was infringing her trademarks and copyrights in a line of weight-loss garments designed to emulate the effects of a sauna. *Beacon Enterprises*, 715 F.2d at 760. Menzies sent a cease-and-desist letter to Beacon at its New York City headquarters, threatening litigation. *Id.* Upon receiving it, Beacon filed a suit in the United States District Court for the Southern District of New York, seeking a judgment declaring that its products did not infringe Menzies' intellectual property rights. *Id.*

We concluded that Menzies' mailing of the cease-and-desist letter into New York was insufficient to give

15

rise to personal jurisdiction over her under section 302(a)(1).  Id. at 762, 766.  We pointed out that "New York courts have consistently refused to sustain section 302(a)(1) jurisdiction solely on the basis of defendant's communication from another locale with a party in New York."  Id. at 766 (collecting cases).  And we thought it "difficult to characterize Menzies' letter alleging infringement in an unspecified locale and threatening litigation in an unspecified forum as an activity invoking the 'benefits and protections' of New York law."  Id.

In Ehrenfeld v. Bin Mahfouz, 9 N.Y.3d 501, 881 N.E.2d 830, 851 N.Y.S.2d 381 (2007), the New York Court of Appeals, responding to a certified question from us, confronted a somewhat analogous fact pattern.  There, the defendant had obtained a default judgment against the plaintiff in English courts for the plaintiff's allegedly libelous statements.  Id. at 505, 881 N.E.2d at 832, 851 N.Y.S.2d at 383.  The plaintiff brought suit in federal court in the Southern District of New York seeking a declaration that she could not be held liable for defamation under the circumstances of that case, and that the defendant's default judgment was therefore not enforceable against her in New York.  She argued that the "defendant

16

ha[d] transacted business in New York because he purposefully projected himself into the state to further a 'foreign litigation scheme'" -- the libel suit in England -- "designed to chill her speech."  Id. at 508, 881 N.E.2d at 834, 851 N.Y.S.2d at 385.

When the case came before us on appeal, we certified to the New York Court of Appeals the question whether section 302(a)(1) conferred jurisdiction in the circumstances presented.  Id. at 504, 881 N.E.2d at 831, 851 N.Y.S.2d at 382; see Ehrenfeld v. Bin Mahfouz, 489 F.3d 542, 551 (2d Cir. 2007).  The Court of Appeals answered in the negative, reasoning:

> Here, none of defendant's relevant New York contacts have invoked the privileges or protections of our State's laws. Quite to the contrary, his communications in this state were intended to further his assertion of rights under the laws of England.  As defendant points out -- and plaintiff does not dispute -- his prefiling demand letter and his service of documents were required under English procedural rules governing the prosecution of defamation actions.  And in none of his letters to plaintiff did defendant seek to consummate a New York transaction or to invoke our State's laws.

Ehrenfeld, 9 N.Y.3d at 509, 881 N.E.2d at 835, 851 N.Y.S.2d at 386.

17

Beacon Enterprises and Ehrenfeld point to the result of the jurisdictional inquiry here.

Like the defendants in those cases, Lisa and Neal were not "present" in New York -- whether physically or through some other continuous contact[2] -- in connection with the underlying dispute in this case. This factor is not alone dispositive, of course. Cf. Deutsche Bank Sec., Inc. v. Montana Bd. of Invs., 7 N.Y.3d 65, 71, 850 N.E.2d 1140, 1142, 818 N.Y.S.2d 164, 166-67 (2006) ("[P]roof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York." (internal quotation marks omitted)). It does, however, set this action apart from those the New York Court of Appeals has described as "the clearest sort of case[s] in which [New York] courts would have 302 jurisdiction," George Reiner & Co., Inc. v. Schwartz, 41 N.Y.2d 648, 652 (1977), a notion plainly grounded in constitutional principles of due

_____

[2] The New York Court of Appeals has recognized that an individual, although not physically present in the state, may still be present in the relevant sense through some "direct and personal involvement" in "sustained and substantial transaction of business." Parke-Bernet Galleries v. Franklyn, 26 N.Y.2d 13, 18, 256 N.E.2d 506, 508, 308 N.Y.S.2d 337, 340 (1970). Participation in an auction by phone is one example. Id. Marvel does not allege such a connection in this case, and we do not perceive one in the record.

18

process developed by the federal courts in and since International Shoe Co. v. Washington, 326 U.S. 310 (1945).

Neither were Lisa and Neal's communications part, or in contemplation, of a course of business dealings with Marvel. This distinguishes them from the sort of communications we found sufficient to confer section 302(a)(1) jurisdiction in PDK Labs, a case relied upon by the district court, but distinguished in Ehrenfeld, 9 N.Y.3d at 510, 881 N.E.2d at 836, 851 N.Y.S.2d at 387. In PDK Labs, we concluded that the defendant had "purposefully availed himself of the New York forum by using [his agent] in New York and apparently elsewhere for many years to advance his interest in his unique 'product' through soliciting funds and negotiating royalty agreements." PDK Labs, 103 F.3d at 1111; see also Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 57 (2d Cir. 1985) (concluding that contract negotiated in part in New York, signed in Georgia and New York, and containing a New York forum selection clause constituted "transaction of business" in New York under section 302(a)(1)). Here, by contrast, the Termination Notices bear no indication that the Kirbys were negotiating or cared to negotiate for or solicit Marvel's business.

Finally, and perhaps most importantly, the Termination Notices, like the letter in <u>Beacon Enterprises</u> and the communications in <u>Ehrenfeld</u>, asserted legal rights under a body of law other than New York's. What the Kirby siblings seek to vindicate are purported termination rights under section 304(c) of the federal copyright laws; they seek no privilege or benefit conferred by New York State law. Section 304(c)(4), moreover, states that termination rights "shall be effected by serving an advance notice in writing upon the grantee [of the initial assignment] or the grantee's successor in title." The Termination Notices thus not only seek to vindicate rights under federal law, they also are a compulsory feature of that body of law.

We think these factors foreclose the exercise of section 302(a)(1) jurisdiction in the circumstances of this case. We conclude that a communication from out-of-state, required for the exercise of rights conferred under a federal statute, cannot alone constitute a purposeful availment of "the benefits and protections of [New York's] laws," at least where the only connection to New York is that the recipient's business headquarters has a New York address.

Marvel's principal argument to the contrary rests on the premise that the Termination Notices are self-executing, legally effective communications.  They are therefore different from the cease-and-desist letter at issue in Beacon Enterprises, Marvel contends, because there the notice did no more than advise the recipient of alleged infringement and threaten future litigation.

To begin with, we doubt Marvel's is an entirely accurate characterization of the Termination Notices:  They are necessary to the exercise of the termination rights, but only the additional act of filing the notices with the Copyright Office consummates the legal act of termination.  See 17 U.S.C. § 304(c)(4)(A).  In any event, Marvel does not explain why the notices' legal effect under federal copyright law renders the act of mailing them any more a "transaction of business" or a purposeful invocation of the benefits and protections of New York law than would be other communications.

Marvel also points to the notices' effects on Marvel in New York, characterizing them as "target[ing] the center of gravity of Marvel's publishing business," and of having been "designed to disrupt and divert license fees from Marvel's New York-based business," leaving Marvel with

21

"no option but to protect its rights and those of its licensees." Appellees' Br. at 47-48 & n.17. These statements may well be essentially true, if perhaps a bit hyperbolic. But the Court in Ehrenfeld rejected virtually identical arguments based on the alleged in-state effects of the English default judgment that the defendant had obtained in the defamation case against the plaintiff, and the in-state action that that judgment would compel. See Ehrenfeld, 9 N.Y.3d at 511, 881 N.E.2d 830, 837, 851 N.Y.S.2d 381, 388. Cf. Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 209 (2d Cir. 2001) (finding that "financial consequences in New York due to the fortuitous location of plaintiffs" are insufficient to confer jurisdiction under section 302(a)(3)). We read Ehrenfeld strongly to suggest that we reject Marvel's arguments in this regard here.

Finally, we are unpersuaded by Marvel's attempts to connect Lisa and Neal with New York through their relationship with other family members. Appellees' Br. at 51; see also Marvel Worldwide, Inc., 2010 WL 1655253, at *4-*5, 2010 U.S. Dist. LEXIS 38701, at *10-*12. The problem with these arguments -- whether they seek to endow Lisa and Neal with their father's jurisdictional status, or to analyze their contacts with New York "collectively" with

22

their other siblings -- is that they identify no legal mechanism by which Jack's, Barbara's, or Susan's actions become those of Lisa or Neal. Absent a bona fide agency relationship -- the existence of which no one has asserted -- there is no basis for imputing to Lisa and Neal actions by their father half a century ago, or coincident actions by their siblings who now live in New York and for that reason are subject to personal jurisdiction here. Doing so would stretch the text of section 302 beyond the breaking point, see N.Y. C.P.L.R. § 302(a) (referring to transaction of business "in person or through an agent").

We conclude that the district court lacked personal jurisdiction over Lisa and Neal Kirby. We therefore vacate the district court's judgment as against those two Kirbys.

**II. Compulsory Joinder**

The Kirbys next argue that the absence of personal jurisdiction over Lisa and Neal requires vacatur of the judgment as against Barbara and Susan too. They rely on Federal Rule of Civil Procedure 19: "Required Joinder of Parties."

23

## A. Federal Rule of Civil Procedure 19

Rule 19 recognizes exceptional circumstances in which the plaintiff's choice of parties or forum must give way because of an absent party's interest in the outcome of the action or involvement in the underlying dispute. See generally 7 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1602 (3d ed. 2008). The Rule's principal provisions are divided into two subsections. Subsection (a) protects certain parties by deeming them "required"; a party who is "required" according to the factors enumerated in subsection (a) is one whose participation is so desirable or important that the party must be joined so long as she or he is "subject to service of process" and joinder "will not deprive the court of subject-matter jurisdiction." Fed. R. Civ. P. 19(a)(1).

Subsection (b) addresses situations in which a party otherwise "required" under subsection (a) cannot be joined for some reason, for example (as in this case), want of personal jurisdiction. In such circumstances, Rule 19(b) requires courts to consider whether, "in equity and good conscience," the party is one without whom the action between the remaining parties cannot proceed -- or, in the traditional terminology, whether the absent party is

24

"indispensable."  Fed. R. Civ. P. 19(b); see also CP Solutions PTE, Ltd. v. General Electric Co., 553 F.3d 156, 159 n.2 (2d Cir. 2009) (per curiam).

We assume, for present purposes, that Lisa and Neal are "required" parties under Rule 19(a).  They are also parties whose joinder is not feasible, inasmuch as we conclude that they are not amenable to personal jurisdiction in the Southern District of New York, and they are unwilling to consent to suit within the jurisdiction.  The remainder of this discussion, then, centers on the effects of Rule 19(b) on these proceedings.

**B.  Indispensability**

Because of the "flexible nature of Rule 19(b) analysis," we review a district court's decision under that rule for abuse of discretion.[3]  Universal Reinsurance Co., Ltd. v. St. Paul Fire & Marine Ins. Co., 312 F.3d 82, 87 (2d

---

[3]  The standard of review applicable to Rule 19(b) is apparently the subject of a circuit split.  See National Union Fire Ins. Co. v. Rite Aid of South Carolina, Inc., 210 F.3d 246, 250 n.7 (4th Cir. 2000) (recognizing the split and collecting cases); compare Universal Reinsurance Co., 312 F.3d at 87 (abuse of discretion), with Keweenaw Bay Indian Community v. Michigan, 11 F.3d 1341, 1346 (6th Cir. 1993) (abuse of discretion for Rule 19(a), but de novo for Rule 19(b)).  In Republic of Philippines v. Pimentel, 553 U.S. 851 (2008), the Supreme Court passed on an opportunity to resolve the question, although it did suggest that the Rule's "in equity and good conscience" language "implies some degree of deference to the district court," id. at 864.

25

Cir. 2002). Here, however, the district court decided -- mistakenly, as we have explained -- that it had personal jurisdiction over Lisa and Neal. The court therefore had no occasion to apply Rule 19(b).

It is ordinarily appropriate for us to vacate the judgment of a district court and remand the cause to it when matters committed to that court's discretion arise for the first time on appeal. See CP Solutions, 553 F.3d at 161. But where a record is fully developed and it discloses that, in our judgment, only one possible resolution of such an issue would fall "within the permissible range of choices" -- in other words, where only one determination by the district court would be within its discretion -- there is no reason to remand. Id. If we did and the court decided to the contrary, we would be duty bound to reverse in any event on the grounds of abuse of discretion.

In this case, the parties have fully briefed the Rule 19(b) issue on appeal, and the facts are straightforward and undisputed. Only one result, we think, is permissible. We therefore resolve the issue in the first instance.[4]

---

[4] There is some authority, albeit none from this Circuit, suggesting that a court of appeals may apply Rule 19 in the first instance when the issue arises for the first time on appeal.

26

Rule 19(b) sets forth four considerations that will ordinarily be among those relevant to the analysis of whether a party is "indispensable." We have restated them as: "(1) whether a judgment rendered in a person's absence might prejudice that person or parties to the action, (2) the extent to which any prejudice could be alleviated, (3) whether a judgment in the person's absence would be adequate, and (4) whether the plaintiff would have an adequate remedy if the court dismissed the suit." CP Solutions, 553 F.3d at 159.

---

See, e.g., Fidelity & Casualty Co. v. Reserve Ins. Co., 596 F.2d 914, 918 (9th Cir. 1979) (considering indispensability in the first instance on appeal in deciding applicability of Fed. R. Civ. P. 21, which permits courts to add or drop parties to avoid dismissing an action); Anrig v. Ringsby United, 591 F.2d 485, 489-92 (9th Cir. 1978) (faulting the district court for failing to consider the dispensability of parties prior to dismissing the entire case, and proceeding to address the question in the first instance); see also Walsh v. Centeio, 692 F.2d 1239, 1241-42 (9th Cir. 1982) (discussing case law in analysis of applicable standard of review of dismissals under Rule 19(b)); Cloverleaf Standardbred Owners Ass'n, Inc. v. National Bank of Washington, 699 F.2d 1274, 1277 n.5 (D.C. Cir. 1983) (suggesting, in dicta, that a court of appeals may apply Rule 19 itself in "cases in which Rule 19 does not figure in a district court's decision but becomes an issue on appeal in conjunction with a jurisdiction or venue challenge pursued by one or more of several defendants").

That we may (or ought to) do so is perhaps born of the notion that we have an independent equitable obligation to protect the interests of absentee parties. See MasterCard Int'l Inc. v. Visa Int'l Service Ass'n, Inc., 471 F.3d 377, 382-83 (2d Cir. 2006). Inasmuch as we conclude that there is indeed only one permissible outcome here, however, we need not rest our decision on this basis.

Applying these factors requires an understanding of the legal interests at stake, here the Kirbys' termination rights under section 304(c).  Central to the current discussion is paragraph (1) of section 304(c), and in particular the following provision:  "In the case of a grant executed by one or more of the authors of the work, termination of the grant may be effected, . . . if such author is dead, by the person or persons who . . . own and are entitled to exercise a total of more than one-half of that author's termination interest."  17 U.S.C. § 304(c)(1) (emphasis added); see also id. § 304(c)(6)(C).

The parties interpret this to mean that at least three of the four Kirbys -- "more than one-half" -- must "effect" termination of their father's assignment in order for any of them to realize their termination rights. Appellants' Br. at 21; Appellees' Br. at 55.  So, all seem to acknowledge, if Barbara and Susan Kirby are disabled by an adverse judgment in this suit from effecting termination, all four Kirbys lose.

Under this interpretation of section 304(c)(1), which we assume without deciding is correct, several of the possible Rule 19(b) considerations are irrelevant.  Marvel cannot, and does not, complain that a judgment rendered in

28

Lisa and Neal's absence prejudices it in any way, because it should be satisfied by a judgment against Barbara and Susan that forecloses Lisa and Neal's rights too. Nor can Barbara and Susan claim prejudice. Any judgment here stands to reflect the full and fair adjudication of their rights under section 304(c). And whatever the result, there is no risk that Barbara and Susan will somehow bear in full a legal obligation that is properly shared by their absent siblings. There is thus no prejudice to Marvel, Barbara, or Susan as "existing parties." Fed. R. Civ. P. 19(b)(1).

We also do not see how a judgment in this case could be crafted to alleviate any prejudice that may exist to absent parties Lisa and Neal. See Fed. R. Civ. P. 19(b)(2). The judgment here will declare the existence vel non of Barbara and Susan's termination rights, and whatever the practical effect of this declaration, it can do no more or less.

Finally, although we can hardly be confident that the absent parties in this case will accept a judgment as the last word in this dispute, we think that any judgment would be "adequate," Fed. R. Civ. P. 19(b)(3), in the sense of honoring the "public stake in settling disputes by wholes, whenever possible." CP Solutions, 553 F.3d at 160

29

(internal quotation marks omitted).  If Marvel wins against Barbara and Susan, the parties' interpretation of section 304(c)(1) implies that the issue is resolved as to all Kirbys; if Barbara and Susan prevail, principles of issue preclusion would likely bar Marvel from relitigating the issue against Lisa and Neal.  See RESTATEMENT (SECOND) OF JUDGMENTS § 29 (1982).

This leaves us with two factors to consider.  The first is potential prejudice to Lisa and Neal arising from their absence.  Fed. R. Civ. P. 19(b)(1).  They complain that by operation of section 304(c)(1)'s "more than one-half" requirement, they stand to have their legal rights finally determined in their absence.  Appellants' Br. at 21-22.  This argument appeals to our "'deep-rooted historic tradition that everyone should have his own day in court.'"  See Richards v. Jefferson County, 517 U.S. 793, 798 (1996) (quoting 18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4449 (3d ed. 2008)).

But the law in this context and elsewhere "'recognize[s] an exception to the general rule when, in certain limited circumstances, a person, although not a party, has his interests adequately represented by someone with the same interests who is a party.'"  Id. (quoting

30

*Martin v. Wilks*, 490 U.S. 755, 762 n.2 (1989)). As we recognized in *CP Solutions*, the potential prejudice to an absent party under Rule 19(b) is mitigated where a remaining party "could champion [his or her] interest." 553 F.3d at 160. And prejudice to absent parties approaches the vanishing point when the remaining parties are represented by the same counsel, and when the absent and remaining parties' interests are aligned in all respects. *Id.*; *Prescription Plan Serv. Corp. v. Franco*, 552 F.2d 493, 497 (2d Cir. 1977).

This lawsuit concerns a single legal issue in which Lisa's and Neal's interests are identical to Barbara's and Susan's. The Kirbys have the same lawyer -- who we are sure was "no less vigorous in [his] advocacy," *Prescription Plan Serv.*, 552 F.2d at 497, because he represented two Kirbys instead of four. And we have been given no reason whatever to think that the proofs advanced by Barbara and Susan are materially different from those Lisa and Neal would have proffered. We therefore see no practical prejudice to Lisa and Neal as a result of adjudicating this case in their absence.

The other remaining consideration is whether Marvel "would have an adequate remedy if the action were

31

dismissed for non-joinder." Fed. R. Civ. P. 19(b)(4). As Marvel points out, because Lisa and Neal are not amenable to personal jurisdiction in New York, and because Barbara and Susan -- New York residents -- are, as far as the record reveals, not amenable to personal jurisdiction in California, the Kirbys might well be able to thwart a declaratory judgment suit brought by Marvel in a forum in either state. Appellees' Br. at 56-57. In light of the nearly non-existent showing of prejudice to any of the parties involved here, we see no reason to permit the Kirbys to withhold consent to any suit in which the forum or litigation posture are not to their liking. See Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 109 (1968) (recognizing a plaintiff's "interest in having a forum").

We conclude, therefore, that the only determination that falls within the range of permissible decisions in the circumstances of this case is that Lisa and Neal are not indispensable parties, and that it was appropriate for the action against Barbara and Susan to have proceeded on its merits.[5]

---

[5] There is an abstract question lurking in the background: Should a court apply the Rule to present circumstances, or instead to the circumstances as they were at the time the party

### III.  Summary Judgment

The remaining Kirbys -- Barbara and Susan -- challenge the district court's grant of summary judgment in favor of Marvel.  "We review a district court's grant of summary judgment de novo.  In reviewing a summary judgment decision, we apply the same standards applied by the district court.  Under this standard, summary judgment may be granted only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'  [Fed. R. Civ. P. 56(a)].  In determining whether there is a genuine dispute as to a material fact, we must resolve all ambiguities and draw all inferences against the moving party."  Garcia v. Hartford Police Dep't, 706

---

initially made its motion for dismissal under Rule 19(b)? Compare Universal Reinsurance Co., 312 F.3d at 89 (noting, in a case in which Rule 19(b) issue did not arise until after first appeal and remand, that "[o]nce the district court has proceeded to final judgment, considerations of finality, efficiency, and economy become overwhelming, and federal courts are directed to salvage jurisdiction where possible" (internal quotation marks and citations omitted)), with Young v. Powell, 179 F.2d 147, 152 (5th Cir. 1950) (reviewing district court's Rule 19(b) analysis based on the "relief asked for" rather than the "relief granted" on the merits in order to prevent prejudice to the defendant).  See generally 7 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1609 (3d ed. 2008).  We need not address it, though, because we conclude that under either approach, the result would be the same:  Lisa and Neal are not indispensable parties.

33

F.3d 120, 126-27 (2d Cir. 2013) (per curiam) (alteration, some citations, and internal quotation marks omitted).

### A. Exclusion of Expert Testimony

We address first the admissibility of the reports and testimony of Barbara and Susan's putative experts, John Morrow and Mark Evanier, who purported to offer historical perspective concerning the relationship between Marvel and Jack Kirby. The district court ruled that the reports and testimony were inadmissible. Marvel Worldwide, Inc., 777 F. Supp. 2d at 729-30. We review this decision for abuse of discretion. Wills v. Amerada Hess Corp., 379 F.3d 32, 41 (2d Cir. 2004).

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It requires for admissibility, among other things, that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). In other words, "[e]xpert testimony must be helpful to the [trier of fact] in comprehending and deciding issues beyond the understanding of a layperson." DiBella v. Hopkins, 403 F.3d 102, 121 (2d Cir. 2005).

We have no doubt that a historian's "specialized knowledge" could potentially aid a trier of fact in some cases. A historian could, for example, help to identify, gauge the reliability of, and interpret evidence that would otherwise elude, mislead, or remain opaque to a layperson. See generally Maxine D. Goodman, Slipping Through the Gate, 60 BAYLOR L. REV. 824, 857 (2008) (commenting that a historian's task is "to choose reliable sources, to read them reliably, and to put them together in ways that provide reliable narratives about the past" (quoting MARTHA C. HOWELL & WALTER PREVENIER, FROM RELIABLE SOURCES: AN INTRODUCTION TO HISTORICAL METHODS 2 (2001))). He or she might helpfully synthesize dense or voluminous historical texts. Id. Or such a witness might offer background knowledge or context that illuminates or places in perspective past events. See, e.g., Int'l Soc. for Krishna Consciousness, Inc. v. Barber, 650 F.2d 430, 440 (2d Cir. 1981) ("In fact, one religious expert at trial remarked that the American movement is 'one of the most unusual examples of transfer of a cultural tradition across broad national and cultural barriers.' This evidence of historical longevity and theological consistency should not be ignored.").

35

But Morrow and Evanier do not bring their expertise to bear in any such way. As the district court recognized, their reports are by and large undergirded by hearsay statements, made by freelance artists in both formal and informal settings, concerning Marvel's general practices towards its artists during the relevant time period. See, e.g., Deposition of Mark Evanier, Dec. 6, 2010, at 18-21, Joint App'x at 957-59. Drawing from these statements, they then speculate as to the motivations and intentions of certain parties, see, e.g., Expert Report of John Morrow at 9, Joint App'x at 1152 ("I do not believe that Goodman, Lee, Marvel or the freelance artists, like Jack Kirby, . . . thought that the material they created was 'work made for hire' . . . ."), or opine on the credibility of other witnesses' accounts, see, e.g., Expert Report of Mark Evanier at 14, Joint App'x at 1105 ("I have great respect and personal affection for Stan Lee, but I disagree with the accounts he has sometimes given . . . .").

Although the Rules permit experts some leeway with respect to hearsay evidence, Fed. R. Evid. 703, "a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." Malletier v. Dooney

& Bourke, Inc., 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007). The appropriate way to adduce factual details of specific past events is, where possible, through persons who witnessed those events. And the jobs of judging these witnesses' credibility and drawing inferences from their testimony belong to the factfinder. See Nimely v. City of New York, 414 F.3d 381, 397-98 (2d Cir. 2005). We therefore think the district court clearly did not abuse its discretion in declining to admit this evidence.

### B. Termination Rights and Work Made for Hire

We thus, at last, arrive at the merits of Marvel's summary judgment motion. At issue is section 304(c) of the Copyright Act of 1976, which, insofar as bears on this litigation, provides:

> Termination of Transfers and Licenses Covering Extended Renewal Term. -- In the case of any copyright subsisting in either its first or renewal term on January 1, 1978, other than a copyright in a work made for hire, the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978 . . . is subject to termination . . . .

17 U.S.C. § 304(c).[6]

---

[6] The termination right in section 304(c) applies only to transfers executed by the author prior to January 1, 1978. Section 203 governs termination of transfers of the rights to

If the author is no longer alive, section 304(c)(2) grants his or her termination rights to specified heirs.  See id. § 304(c)(2)(B).  The provision "protect[s] the property rights of widows and children in copyrights" by granting them the power to undo earlier transfers and to enjoy the remainder of the copyright term.[7]  Larry Spier, Inc. v. Bourne Co., 953 F.2d 774, 778 (2d Cir. 1992).

But section 304(c) provides that termination rights under that section do not exist with respect to "work[s] made for hire."  17 U.S.C. § 304(c).  Where a work is "made for hire," copyright law deems the employer to be the "author" for purposes of copyright ownership.  Copyright Act of 1909 § 62 (formerly codified at 17 U.S.C. § 26) ("[T]he word 'author' shall include an employer in the case

_____

works executed on or after January 1, 1978.  See 17 U.S.C. § 203(a).  We have cautioned that "Section 203 and Section 304 are different provisions involving different rights."  Larry Spier, Inc. v. Bourne Co., 953 F.2d 774, 779 (2d Cir. 1992).

[7]  Thirty-nine years, to be precise.  Termination rights may be effected "during a period of five years beginning at the end of fifty-six years from the date copyright was originally secured, or beginning on January 1, 1978, whichever is later." 17 U.S.C. § 304(c)(3).  Under section 304, as amended by the Sonny Bono Copyright Term Extension Act, the full copyright term of the works at issue -- consisting of a 28-year initial term plus a 67-year renewal term -- is 95 years.  See 17 U.S.C. § 304(a), (b).  At stake here, then, is the 39 years that will be remaining on each of the works' copyright terms at the time they turn 56.

of works made for hire."); see also Copyright Act of 1976 § 201(b), 17 U.S.C. § 201(b) ("In the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title . . . ."). The hired party, although "the 'author' in the colloquial sense," Shapiro, Bernstein & Co. v. Bryan, 123 F.2d 697, 699 (2d Cir. 1941), therefore never owned the copyrights to assign. It stands to reason, then, that there are no rights the assignment of which his or her heirs may now terminate.

Marvel argues that all of the works at issue in this case fall into the category of "work made for hire."

**1.** **The Instance and Expense Test.** To determine whether a work is "work made for hire" within the meaning of section 304(c), we apply case law interpreting that term as used in the 1909 Act, the law in effect when the works were created. See Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 156-63 (2d Cir. 2003). This requires us to apply what is known as the "instance and expense test."

**a.** **Origins.**

The origins of the instance and expense test were described at some length by Judge Newman's opinions in

39

Estate of Burne Hogarth v. Edgar Rice Burroughs, Inc., supra, and Martha Graham School and Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc., 380 F.3d 624, 633-36 (2d Cir. 2004).

The test was developed from two lines of cases. One was our court-made work-for-hire jurisprudence. "Because the 1909 Act did not define 'employer' or 'works made for hire,' the task of shaping these terms fell to the courts." Community for Creative Non-Violence v. Reid, 490 U.S. 730, 744 (1989). Using Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 248 (1903) -- the Supreme Court's first encounter with the work-for-hire phenomenon -- as a guidepost, our early cases focused principally on whether the work at issue was created within the scope of a traditional employment relationship. See, e.g., Tobani v. Carl Fischer, Inc., 98 F.2d 57, 59 (2d Cir. 1938); Shapiro, Bernstein & Co., Inc. v. Bryan, 123 F.2d 697, 698-700 (2d Cir. 1941). Work-for-hire doctrine thus served to identify which party within the traditional employment relationship was the statutory "author," and hence owned the copyright in the work from the time of creation.

The second doctrine developed to address what was initially considered a separate issue under the 1909 Act:

40

rights in commissioned works created by independent contractors. The issue in this situation, at least in the early cases, was not who the statutory author was -- the author was the independent contractor. The issue was whether the hiring party nevertheless owned copyrights by way of the author's implied assignment of those rights; and, if so, whether the assignment applied to only the "original" copyright term, or to both the "original" term and an "expectancy" in the so-called "renewal" term.

We addressed the first half of this issue in Yardley v. Houghton Mifflin Co., 108 F.2d 28 (2d Cir. 1939). There we concluded that if a party "is solicited by a patron to execute a commission for pay, the presumption should be indulged that the patron desires to control the publication of copies and that the artist consents that he may, unless by the terms of the contract, express or implicit, the artist has reserved the copyright to himself." Id. at 31. And in later cases, we seemed to answer the second half, limiting Yardley's presumption in favor of implied assignment to the original term. See Estate of Burne Hogarth, 342 F.3d at 159; Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 221 F.2d 569, 570 (1955).

The two doctrines first converged in <u>Brattleboro Publishing Co. v. Winmill Publishing Corp.</u>, 369 F.2d 565, 567 (2d Cir. 1966). That case concerned rights in the original term in an independent contractor setting -- like in <u>Yardley</u> -- but we nevertheless began our analysis by discussing traditional work-for-hire doctrine. <u>Id.</u> at 567. We relied on Professor Melville Nimmer's copyright treatise, which we described as recognizing "a presumption in the absence of an express contractual reservation to the contrary, that the copyright shall be in the person at whose <u>instance and expense</u> the work is done." <u>Id.</u> (emphasis added) (citing NIMMER ON COPYRIGHT 238 (1964)). And we could "see no sound reason why these same principles are not applicable when the parties bear the relationship of employer and independent contractor." <u>Id.</u> at 568.

This discussion does not appear to have been necessary to the result inasmuch as the Court went on to resolve the case on the grounds of <u>Yardley</u>'s presumption. <u>Id.</u> Just as curious was the <u>Brattleboro</u> Court's attribution of the phrase "instance and expense" to Professor Nimmer. The phrase is apparently not to be found in the cited passage on work-for-hire doctrine. <u>See</u> MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 5.03 n.171b (Matthew Bender,

42

Rev. Ed. 2013).  It seems instead to be drawn from a Ninth Circuit opinion in an independent contractor case published the year before.  See Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298, 300 (9th Cir. 1965); see generally Martha Graham, 380 F.3d at 634 n.17.

But we effectively adopted the union of these two approaches in Picture Music, Inc. v. Bourne, Inc., 457 F.2d 1213, 1216 (2d Cir. 1972), relying on both work-for-hire and implied assignment cases to conclude that an independent contractor's works were "made for hire," and therefore that the hiring party owned both the original and renewal term. Id. at 1216.  And when we next confronted the issue, in Playboy Enterprises, Inc. v. Dumas, 53 F.3d 549, 554 (2d Cir. 1995), we explained that "an independent contractor is an 'employee' and a hiring party an 'employer' for purposes of the [1909 Act] if the work is made at the hiring party's 'instance and expense.'"[8]

---

[8] Our approach has been criticized.  See NIMMER ON COPYRIGHT § 9.03[D].  It was also called into question by language in Community for Creative Non-Violence v. Reid, 490 U.S. 730, 744 (1989), which discussed some of our cases as background to interpreting the 1976 Act's somewhat different "work made for hire" provisions, 17 U.S.C. § 101.  We nonetheless reaffirmed our adherence to the instance and expense test in cases turning on the interpretation of the 1909 Act's work-for-hire provisions in Estate of Burne Hogarth, supra.

### b. General Principles

We have stated as a general rule that "[a] work is made at the hiring party's 'instance and expense' when the employer induces the creation of the work and has the right to direct and supervise the manner in which the work is carried out." Martha Graham, 380 F.3d at 635. Our case law is, however, not so tidy. To the extent we can distill from our prior cases a set of principles applicable here, they are these:

"Instance" refers to the extent to which the hiring party provided the impetus for, participated in, or had the power to supervise the creation of the work. Actual creative contributions or direction strongly suggest that the work is made at the hiring party's instance. See, e.g., Playboy Enterprises, Inc., 53 F.3d at 556 (evidence that independent contractor "was given specific instructions for his early submissions to Playboy" suggested work for hire); Yardley, 108 F.2d at 30-31 ("[W]here a photographer takes photographs of a person who goes or is sent to him in the usual course, and is paid for the photographs and for his services in taking them, the right of copyright is in the sitter or in the person sending the sitter to be photographed, and not in the photographer . . . .").

44

The "right to direct and supervise the manner in which the work is carried out," Martha Graham, 380 F.3d at 635, moreover, even if not exercised, is in some circumstances enough to satisfy the "instance" requirement. It may be sufficient, for example, where the hiring party makes a particularly strong showing that the work was made at its expense, Scherr v. Universal Match Corp., 417 F.2d 497, 501 (2d Cir. 1969) (noting "the overwhelming appropriation of [the hiring party's] funds, time and facilities to the project"), or where prior dealings between the parties on similar assignments, as part of an ongoing arrangement, have rendered fine-grained supervision unnecessary, Playboy Enterprises, Inc., 53 F.3d at 556 ("right to control" and exercise of control with respect to "certain characteristics" sufficient in light of earlier "specific assignments").

But "inducement" or "control" alone can be incidental enough not to vest copyright ownership in the hiring party. For example, in Siegel v. National Periodical Publications, Inc., 508 F.2d 909, 914 (2d Cir. 1974), we concluded that it was insufficient that the independent contractor "revise[d] and expand[ed] the Superman material at the request of the [hiring party]," because "Superman had

45

been spawned by the [independent contractor] four years before the relationship [with the hiring party] existed." Indeed, even in cases arising under traditional employment law, a work created "as a special job assignment" may not be a "work made for hire." Shapiro, Bernstein & Co., 221 F.2d at 570.

The "expense" component refers to the resources the hiring party invests in the creation of the work. We have, at least in some cases, continued the tradition of treating the incidents of a traditional employment relationship as relevant to the analysis. See, e.g., Martha Graham, 380 F.3d at 637-41. We have, moreover, suggested that the hiring party's provision of tools, resources, or overhead may be controlling. Id. at 638 ("It may well be that the resources of the Center -- notably, its rehearsal space and the dancers enrolled at the School -- significantly aided Graham in her choreography, thereby arguably satisfying the 'expense' component . . . ."). But cf. Playboy Enterprises, Inc., 53 F.3d at 555 (finding that factors relevant to work for hire analysis under the 1976 Act, like setting hours or providing tools, have "no bearing on whether the work was made at the hiring party's expense").

In other cases, however, we seem to have focused mostly on the nature of payment: payment of a "sum certain" suggests a work-for-hire arrangement; but "where the creator of a work receives royalties as payment, that method of payment generally weighs against finding a work-for-hire relationship." Playboy Enterprises, Inc., 53 F.3d at 555. We note, though, that this distinction appears to be a rather inexact method of properly rewarding with ownership the party that bears the risk with respect to the work's success. See Twentieth Century Fox Film Corp. v. Entertainment Distributing, 429 F.3d 869, 881 (9th Cir. 2005) (noting that publisher took on "all the financial risk of the book's success"); see also Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc., 375 F.2d 639, 643 (2d Cir. 1967) (finding relevant employee's "freedom to engage in profitable outside activities without sharing the proceeds with [the hiring party]").

Our case law counsels against rigid application of these principles. Whether the instance and expense test is satisfied turns on the parties' creative and financial arrangement as revealed by the record in each case.

If the hiring party is able to satisfy the instance and expense test, it "is presumed to be the author

47

of the work," and the independent contractor can overcome the presumption only "by evidence of an agreement to the contrary."[9] Playboy Enterprises, Inc., 53 F.3d at 556.

### 2. Application of the Instance and Expense Test in the Present Case.

Applying these principles to the facts in the record before us -- a challenging endeavor in some respects[10] -- we conclude that the works were created at Marvel's instance and expense, and that Barbara and Susan have not adduced evidence of an agreement to the contrary

---

[9] Marvel sees this as a formal "burden shifting framework." Under that framework, as Marvel conceives of it, the hiring party must "come forward with 'some credible evidence' that the Works were created at its instance and expense," from which showing "arises an 'almost irrebuttable presumption' that the Works were works made for hire." Appellees' Br. at 22 (citations omitted). Neither the "some credible evidence" statement -- a cherry-picked comment from a Ninth Circuit opinion, see Twentieth Century, 429 F.3d at 877 -- nor the "almost irrebuttable presumption" language -- a Fifth Circuit opinion's description of our approach, noted in our opinion in Estate of Burne Hogarth, 342 F.3d at 158 (quoting Easter Seal Society for Crippled Children & Adults of Louisiana, Inc. v. Playboy Enterprises, 815 F.2d 323, 327 (5th Cir. 1987)) -- is an accurate statement of our case law.

[10] The facts underlying this dispute took place decades ago, and Jack Kirby is, of course, no longer alive to provide an account of his working relationship with Marvel during the relevant time period. This leaves us to reconstruct the arrangement through (1) the deposition testimony of Stan Lee, whose credibility the Kirbys contest; (2) the depositions and declarations of other comic book artists who worked for Marvel at various times, but likely under different arrangements from Kirby's; (3) the depositions of the Kirby children, who have little direct knowledge; and (4) some documentary evidence concerning Kirby's contributions to or creation of some of the works.

48

contemporaneous with the creation of the works. We therefore conclude that the district court was correct to award summary judgment in favor of Marvel.

### a. Instance.

The evidence, construed in favor of the Kirbys, establishes beyond dispute that the works in question were made at Marvel's instance.

Although Jack Kirby was a freelancer, his working relationship with Marvel between the years of 1958 and 1963 was close and continuous. Stan Lee considered Kirby to be Marvel's best artist, Lee Dep. at 30, Joint App'x at 2450, an assessment reinforced by the admiration of Kirby by his contemporaries, see Deposition of Lawrence Lieber ("L. Lieber Dep."), Jan. 7, 2011, at 104-05, Joint App'x at 1530-31; Deposition of John Romita ("Romita Dep."), Oct. 21, 2010, at 75-76, Joint App'x at 360-61. Lee "wanted to use Jack for everything," Lee Dep. at 36, Joint App'x at 2456, and Kirby appears to have been kept busy with assignments from Marvel, id. at 37, Joint App'x at 2457.

Marvel published the great majority of Kirby's work during these years -- 1958 through 1963. There are indications in the record that artists did customarily work with more than one publisher during the relevant time

49

period, see, e.g., L. Lieber Dep. at 74-75, Joint App'x at 1521-22, and a handful of Kirby's works between 1958 and 1963 were not published by Marvel, see Excerpt of JACK KIRBY CHECKLIST (Two Morrows Gold ed. 2008), Joint App'x at 1751-62. But it is beyond dispute that most of Kirby's work during this period was published by Marvel and for established Marvel titles. Id.

Understood as products of this overarching relationship, Kirby's works during this period were hardly self-directed projects in which he hoped Marvel, as one of several potential publishers, might have an interest; rather, he created the relevant works pursuant to Marvel's assignment or with Marvel specifically in mind. Kirby's ongoing partnership with Marvel, however unbalanced and under-remunerative to the artist, is therefore what induced Kirby's creation of the works.

Marvel also played at least some creative role with respect to the works. Kirby undoubtedly enjoyed more creative discretion than most artists did under the "Marvel Method," a fact Lee readily admits. Lee Dep. at 70, Joint App'x at 2490. But the only evidence on the issue indicates that he did not work on "spec" (speculation) -- that is, he worked within the scope of Marvel's assignments and titles.

50

*Id.* at 48, Joint App'x at 2468; Deposition of Neal Kirby, June 30, 2010, at 167-68, Joint App'x at 1592-93. There is no disputing, moreover, that Marvel had the power to reject Kirby's pages and require him to redo them, or to alter them, a power it exercised from time to time. *Id.* at 234-35, Joint App'x at 1599-1600; Deposition of Susan Kirby, Oct. 25, 2010, at 37, Joint App'x at 1607. And there is evidence that Kirby collaborated with Lee with respect to many of the works. Lee Dep. at 118, Joint App'x at 2538.

Marvel's inducement, right to supervise, exercise of that right, and creative contribution with respect to Kirby's work during the relevant time period is more than enough to establish that the works were created at Marvel's instance.

The Kirbys' attempts to avoid this conclusion are unsuccessful. Their argument is that the "right to supervise" referred to in our case law requires a legal, presumably contractual, right. Appellants' Br. at 42-45. We find no hint of this requirement in our case law applying the instance and expense test. Nor do the Kirbys provide a principled reason why Marvel's active involvement in the creative process, coupled with its power to reject pages and request that they be redone, should not suffice.

51

The Kirbys also point to factual disputes over who actually created the characters, plots, and other concepts in Marvel's comic books during the relevant time period, mostly in an attempt to discredit Lee and find fault in the district court's reading of the record. Appellants' Br. at 33-35. Questions of who created the characters are mostly beside the point. That Marvel owes many of its triumphs to Kirby is beyond question. But the hired party's ingenuity and acumen are a substantial reason for the hiring party to have enlisted him. It makes little sense to foreclose a finding that work is made for hire because the hired artist indeed put his exceptional gifts to work for the party that contracted for their benefit.

**b.   Expense.**

Whether the Works were created at Marvel's expense presents a more difficult question. We ultimately find ourselves in agreement with the district court and in favor of Marvel here too.

The facts underlying the expense component are not in dispute. Marvel paid Kirby a flat rate per page for those pages it accepted, and no royalties. It did not pay for Kirby's supplies or provide him with office space. It was free to reject Kirby's pages and pay him nothing for

52

them.  The record contains anecdotal evidence that Marvel did in fact reject Kirby's work or require him to redo it on occasion, if less often than it did the work of other artists, but with what frequency is unclear.

Marvel argues that its payment of a flat rate for Kirby's pages is all that matters.  It relies on our suggestion in Playboy Enterprises, 53 F.3d at 555, that "the 'expense' requirement [is] met where a hiring party simply pays an independent contractor a sum certain for his or her work."  Because, Marvel argues, it paid Kirby a sum certain when it accepted his pages -- irrespective of whether the pages required edits or additions, were ultimately published, or were part of a comic book that was a commercial success -- it took on the risk of financial loss.

The Kirbys urge us to focus not on the risk Marvel took at the time it purchased the pages, but on the risk Kirby took when he set out to create them.  Until Marvel purchased Kirby's pages, they point out, Kirby had undertaken all of the costs of producing the drawings -- time, tools, overhead -- and shouldered the risk that Marvel would reject them, leaving him in the lurch.  Marvel's purely contingent payment, they argue, thus acted more like a royalty than a sum certain.  Appellants' Br. at 36-42.

This argument might give us pause if Kirby's relationship with Marvel comprised discrete engagements with materially uncertain prospects for payment, or, indeed, if he undertook to create the works independent of Marvel. But there is no evidence of which we are aware to either effect. The evidence suggests instead that Marvel and Kirby had a standing engagement whereby Kirby would produce drawings designed to fit within specific Marvel universes that his previously purchased pages had helped to define. When Kirby sat down to draw, then, it was not in the hope that Marvel or some other publisher might one day be interested enough in them to buy, but with the expectation, established through their ongoing, mutually beneficial relationship, that Marvel would pay him. And the record makes clear that in the run of assignments, this expectation proved warranted.

Kirby's completed pencil drawings, moreover, were generally not free-standing creative works, marketable to any publisher as a finished or nearly finished product. They built on preexisting titles and themes that Marvel had expended resources to establish -- and in which Marvel held rights -- and they required both creative contributions and production work that Marvel supplied. That the works are

now valuable is therefore in substantial part a function of Marvel's expenditures over and above the flat rate it paid Kirby for his drawings.

In the final analysis, then, the record suggests that both parties took on risks with respect to the works' success -- Kirby that he might occasionally not be paid for the labor and materials for certain pages, and Marvel that the pages it did pay for might not result in a successful comic book. But we think that Marvel's payment of a flat rate and its contribution of both creative and production value, in light of the parties' relationship as a whole, is enough to satisfy the expense requirement.

### c. **Agreement to the Contrary.**

Because Marvel has satisfied the instance and expense test, a presumption arises that the works in question were "works made for hire" under section 304(c). This presumption can be overcome only by evidence of an agreement to the contrary contemporaneous with the creation of the works.

The Kirbys' showing in this regard consists mostly of negative or elliptical inferences concerning the parties' agreement at the time. For example, they point to a 1975 assignment executed by Jack Kirby that purported to transfer

interests in certain works to Marvel (but also averred that all of his work was for hire), which they say suggests the parties' understanding that Marvel did not already own the rights. Appellants' Br. at 48. They also call to our attention evidence that indicates that Marvel paid Kirby during the relevant time periods with checks that contained a legend with assignment, instead of work-for-hire, language. Id. at 47.

This evidence is not enough to enable the Kirbys to survive the motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."); Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999) ("[A]n inference is not a suspicion or a guess." (internal quotation marks omitted)). It is all too likely that, if the parties thought about it at all, Kirby's assignments at the time he was paid or later were redundancies insisted upon by Marvel to protect its rights; we decline to infer from Marvel's suspenders that it had agreed to give Kirby its belt.

* * *

In sum, the district court made no error, in our view, in determining as a matter of law that the works were made at Marvel's instance and expense, and that the parties had no agreement to the contrary. The remaining Kirbys, Barbara and Susan, are therefore without termination rights under section 304(c), and the district court properly granted Marvel's motion for summary judgment as to them.

## CONCLUSION

For the foregoing reasons, we vacate the district court's judgment as against Lisa and Neal Kirby and remand with instructions to the district court to dismiss the action against them for want of personal jurisdiction. We affirm the judgment in favor of Marvel as against Barbara and Susan Kirby. Each party shall bear his, her, or its own costs.

57