11-3919-cv
Singer v. Ferro

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: August 20, 2012     Decided: April 1, 2013)

Docket No. 11-3919-cv

-------------------------------------

KENT SINGER, THOMAS NOLLNER, JONATHAN DECKER,

Plaintiffs-Appellants,

- v -

CHRISTOPHER C. FERRO, sued in his individual capacity, JON BECKER, sued in his individual capacity, PAUL J. VAN BLARCUM, Ulster County Sheriff, sued in his individual capacity, JAMES R. HANSTEIN, Superintendent of Corrections, sued in his individual capacity, FRANK FALUOTICO, sued in his individual capacity, COUNTY OF ULSTER,

Defendants-Appellees.

-------------------------------------

Before: NEWMAN, CABRANES, and SACK, Circuit Judges.

Appeal by the plaintiffs from a judgment of the United States District Court for the Northern District of New York (David N. Hurd, Judge) granting summary judgment to the defendants on the plaintiffs' First Amendment claims asserted pursuant to 42 U.S.C. § 1983. The plaintiffs, at all relevant times public employees, alleged that the defendants, government officials, retaliated against them for exercising their First Amendment rights of freedom of speech and of political association. The district court concluded that the plaintiffs could not sustain their claims because the conduct for which they

assert the defendants retaliated did not implicate a matter of public concern.  We agree with the district court, and therefore affirm.

STEPHEN BERGSTEIN, Bergstein & Ullrich, LLP, Chester, New York, for Plaintiffs-Appellants.

EARL T. REDDING, Roemer Wallens Gold & Mineaux LLP, Albany, New York, for Defendants-Appellees.

SACK, Circuit Judge:

Plaintiffs Kent Singer, Thomas Nollner, and Jonathan Decker appeal from a judgment of the United States District Court for the Northern District of New York (David N. Hurd, Judge) granting summary judgment to the defendants on the plaintiffs' First Amendment retaliation claims brought pursuant to 42 U.S.C. § 1983.  The plaintiffs allege that the defendants, who are supervisors or officials at the Ulster County, New York Sheriff's Office and the county jail, took adverse employment actions against them in retaliation for a parody created by Singer that suggested corruption among jail officials, and for subsequently filing a lawsuit based upon this alleged retaliation.  Because we agree with the district court that neither Singer's parody nor the plaintiffs' lawsuit were what the law considers to be, for these purposes, speech "[1] as a citizen [2] on a matter of public concern," Garcetti v. Ceballos, 547 U.S. 410, 418 (2006), we affirm.

2

**BACKGROUND**

This lawsuit arises out of events that took place during the autumn of 2008 at the Ulster County Jail (the "UCJ") in Ulster County, New York. At the time, Singer, Decker, and Nollner were employed at the UCJ, Singer as a corporal, and Decker and Nollner as corrections officers.

### A. The Parody

During a shift in mid-September 2008, Singer created a parody on his work computer. A copy of it is annexed to this opinion. It was a spoof on the familiar Absolut Vodka advertisements, which typically display an Absolut Vodka bottle adorned or transformed in some thematic fashion, and beneath the bottle a two-word phrase beginning with the word "Absolut." Singer's version displayed in or on the bottle pictures of four UCJ officials -- two of whom are defendants Becker and Ferro -- and the caption read, "Absolut Corruption." The parody was not original; Singer got the idea from a similar "Absolut Corruption" parody that he had found on the Internet. He printed out the previous version and then overlaid it with images of his targets.

At his deposition, Singer described his parody as "a political statement" that he "thought . . . was funny." Dep. of Kent Singer, Oct. 25, 2010 ("Singer Dep."), at 19; Joint App'x at 237. He meant the parody to refer to what he considered to be corrupt practices among jail officials involving preferential hiring and staffing, selective enforcement in matters of employee

3

discipline, and other miscellaneous forms of favoritism. When asked whether "the reasons [he regarded the persons portrayed as corrupt] are generally internal reasons," he replied "Yes," stating that his complaints concerned both his "specific employment within the jail" and matters of employment "in general." Singer Dep. at 39; Joint App'x 242.

After he created the parody, Singer showed it to five fellow employees. Among them were Nollner and Decker. Singer then discarded the parody in a trash can in an employee common area. He testified at his deposition that he never intended to show it to anyone else. His intentions were thwarted, however, when another employee retrieved the parody from the trash. Eventually, it made its way to the people depicted on the bottle, including defendants Ferro and Becker.[1]

### B. The Alleged Retaliation

Ferro and Becker, who were both UCJ supervisors, thought that all three of the plaintiffs were involved in creating the parody. They allegedly used their supervisory authority to retaliate against the plaintiffs.

The first incident took place in late September 2008. Since April of that year, Singer had not been required to participate in "prisoner transports." This was at Singer's request: His mother had been ill, and he had asked to be removed

---

[1] Warden Ray Acevedo, who is not a named defendant, also received a copy.

from transport duty so that he could remain at the UCJ, ready to leave and attend to her in case of emergency. But soon after the parody was circulated, Singer found himself assigned to transports. Ferro and another supervisor were responsible for the assignments to prisoner transports at this time.

Singer complained about the assignment. On October 1, 2008, Becker called Singer into his office for a meeting. Singer had heard that Ferro and Becker were "head hunting"[2] over the parody, Singer Dep. at 81; Joint App'x at 253, so he concealed a small tape recorder in his breast pocket in order to record the meeting. During the meeting, Becker told Singer that he would respect Singer's request to be kept off transport duty, but also confronted Singer about the parody, telling him that he knew Singer had created it.

The alleged retaliation against Decker and Nollner began about the same time. Decker asserts that one day shortly after the parody was circulated, he became ill while at work and went to Ferro's office to ask if he could leave for the day. Ferro not only declined the request, but also told Decker that he "heard from other people that [Decker] had something to do with [the parody]," and proposed that he and Decker "deal with [it] the old fashioned way" by "tak[ing] [the matter] outside." Dep.

_____

[2] Singer was apparently employing a slang use of the expression: "The process of attempting to remove influence and power from enemies, especially political enemies." http://www.thefreedictionary.com/headhunting (last visited Mar. 28, 2013).

5

of Jonathan Decker, Oct. 4, 2010 ("Decker Dep."), at 63; Joint App'x at 192.

Decker and Nollner also allege that their perceived involvement with the parody affected their work assignments. Both Decker and Nollner had been members of the Sheriff's Emergency Response Team ("SERT") -- a unit that dealt with "problem inmates" -- for about a decade. Dep. of Thomas Nollner, Oct. 4, 2010 ("Nollner Dep.), at 13; Joint App'x at 51; Decker Dep. at 26; Joint App'x at 155. They allege that in a March 2009 SERT meeting, Becker looked directly at Decker and Nollner while telling the group that he "kn[e]w SERT members were in the room when Corporal Singer made the parody," Nollner Dep. at 53; Joint App'x at 91, and Ferro then stated that he had "lost a lot of respect" for those members, Nollner Dep. at 58; Joint App'x at 96. Becker then assigned two leadership positions in SERT to members who had less seniority than Decker and Nollner.

### C. Procedural History

On June 15, 2009, the plaintiffs brought this lawsuit pursuant to 42 U.S.C. § 1983. The parody, they contended, was speech on a matter of public concern. They argued that Ferro and Becker's retaliation therefore violated Singer's right to freedom of speech, and Decker and Nollner's right to political association -- all guaranteed by the First Amendment.

Soon after the lawsuit was filed, at the urging of Ulster County Undersheriff Frank Faluotico, Warden Acevedo

6

removed Decker and Nollner from the SERT Team entirely. Acevedo testified that he did so because the lawsuit had created "friction" amongst team members. Dep. of Ray Acevedo, Oct. 27, 2010, at 21-22; Joint App'x at 303. Faluotico testified that "[t]he lawsuit had caused a breakdown in communication which was a breakdown in officer safety." Dep. of Frank P. Faluotico, Jr., Oct. 27, 2010, at 16; Joint App'x at 320. Decker and Nollner assert that this was a pretext, and that their removal was in fact solely in retaliation for their filing of the lawsuit.

During discovery, the plaintiffs turned over the tape-recording Singer had made of his October 1, 2008 meeting with Becker regarding the assignment to prisoner transports. The revelation that Singer had tape-recorded the meeting prompted an investigation by the Office of the Ulster County Sheriff. On November 2, 2009, disciplinary charges pursuant to New York Civil Service Law § 75 were levied against Singer for alleged violation of prison rules prohibiting recording and other electronic devices on parts of the premises. Singer was suspended for thirty days without pay pending resolution of the section 75 proceedings. Like Decker and Nollner, Singer asserts that this was all a further pretext for punishing him in retaliation for his filing suit.

On December 15, 2009, the plaintiffs amended their complaint to add further allegations of violations of their constitutional rights. Decker and Nollner alleged that Faluotico violated their First Amendment rights by causing them to be

7

removed from the SERT Team after they filed suit. Am. Compl. ¶ 30; Joint App'x at 18-19. Singer alleged that Paul J. Van Blarcum (the Ulster County Sheriff) and James R. Hanstein (the Superintendent of the Corrections Division) had caused baseless section 75 proceedings to be filed against him in retaliation for bringing the suit. Am. Compl. ¶¶ 33-43; Joint App'x at 19-21.

On January 14, 2011, the defendants moved for summary judgment. They argued, among other things, that neither Singer's parody nor the plaintiffs' lawsuit constituted speech on a matter of public concern, as is required for a public employee to sustain a First Amendment claim against his employer. See Connick v. Myers, 461 U.S. 138, 146 (1983). The district court agreed, granting summary judgment to the defendants on all claims. Singer v. Ferro, No. 09-cv-690, 2011 WL 4074177, *10, 2011 U.S. Dist. LEXIS 103258, *27 (N.D.N.Y. Sept. 13, 2011). The court also denied the plaintiffs' motion to supplement their pleadings -- Singer had in the interim been terminated pursuant to the section 75 proceedings, and wanted to add a wrongful discharge claim -- as futile. Id., 2011 U.S. Dist. LEXIS 103258, at *28.

Judgment was entered for the defendants on September 13, 2011, and the plaintiffs appealed.

8

**DISCUSSION**

The plaintiffs appeal from the district court's order granting summary judgment on the plaintiffs' claims, pursuant to 42 U.S.C. § 1983, of retaliation against (A) Singer for creating the Absolut Corruption parody, (B) Decker and Nollner for associating with Singer in connection with the parody, and (C) all plaintiffs for the filing of, or speech made in connection with, this action. The plaintiffs assert that the defendants retaliated against them for conduct that is protected by the First Amendment, and that this retaliation is therefore redressable under section 1983. "We review the district court's grant of summary judgment de novo, drawing all reasonable inferences and resolving all ambiguities in favor of the non-movant." Grain Traders, Inc. v. Citibank, N.A., 160 F.3d 97, 100 (2d Cir. 1998).

### A. The Parody

"The mere fact of government employment does not result in the evisceration of an employee's First Amendment rights." Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003). But public employment does substantially curtail the right to speak freely in a government workplace. See Mandell v. County of Suffolk, 316 F.3d 368, 382 (2d Cir. 2003) (public employee's free speech rights "are not absolute"). One limitation is that the First Amendment protects a public employee from retaliation by his or her employer for the employee's speech only if "the employee

9

sp[eaks] [1] as a citizen [2] on a matter of public concern." Garcetti v. Ceballos, 547 U.S. 410, 418 (2006).

A matter of public concern is one that "relat[es] to any matter of political, social, or other concern to the community." Connick, 461 U.S. at 146. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Id. at 147-48. Among the relevant considerations is "whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." Lewis v. Cohen, 165 F.3d 154, 163-64 (2d Cir.), cert. denied, 528 U.S. 823 (1999). The question of whether a public employee spoke as a citizen on a matter of public concern is a question of law. Connick, 461 U.S. at 148 n.7, 150 n.10. Only if the court concludes that the employee did speak in this manner does it move on to the so-called Pickering balancing, at which stage "a court . . . balances the interests of the employer in providing effective and efficient public services against the employee's First Amendment right to free expression." Lewis, 165 F.3d at 162 (internal citations and quotation marks omitted).

Singer contends that his Absolut Corruption parody constitutes speech on a matter of public concern because it addressed alleged corruption in a public institution. During his deposition, Singer was asked to identify precisely the corruption he meant to reference by showing Superintendent Ebel, Warden Acevedo, Ferro, and Becker in the parody.

10

Singer apparently suspected Superintendent Ebel of in some way -- it is not clear how -- favoring Becker and Ferro for a promotion to captain, even though it is undisputed by Singer that another officer was promoted before Becker, and that Ferro was never promoted. Singer Dep. at 26-27; Joint App'x at 239. Warden Acevedo was corrupt, Singer explained, because he had been arrested sixteen years before for soliciting prostitution. Singer Dep. at 27-28; Joint App'x at 239.

As for Ferro, Singer asserted that he was more likely to grant days off to his friends -- resulting in "payroll discrepancies" -- although Singer could identify no specific instances of such a practice. Singer Dep. at 28, 30-31; Joint App'x at 239-40. According to Singer, Ferro was also "famous for womanizing." Singer Dep. at 28; Joint App'x at 239. And Becker allegedly was corrupt for having received a promotion to head the SERT Team despite his lack of supervisory experience. Singer Dep. at 32-33; Joint App'x at 240-41. Finally, Singer testified more generally that his own complaints were ignored, and that certain of his colleagues were favored with respect to assignments and discipline. Singer Dep. at 40-43; Joint App'x at 242-43.

We have recognized that governmental corruption is plainly a potential topic of public concern. See, e.g., Johnson, 342 F.3d at 112-13 (concluding that speech "alleg[ing] unlawful and corruptive practices" is on a matter of public concern);

11

Lewis, 165 F.3d at 164 (discussing as the "typical" public employee speech case one in which the speech concerns "corruption or public wrongdoing"). But it does not follow that any accusation of an employer practice that is alleged to be "corrupt" qualifies for protection. In other words, the First Amendment does not protect all private ventings of disgruntled public employees. Only that "corruption" which constitutes "a subject of general interest . . . to the public," City of San Diego v. Roe, 543 U.S. 77, 84 (2004), is potentially the object of First Amendment solicitude.

The "corrupt practices" referred to by Singer's parody are at best of marginal "public interest." Most -- payroll discrepancies, promotions, discipline -- are employment-related matters, as Singer acknowledged during his deposition. It is possible that corruption in these respects, if sufficiently egregious or widespread, might implicate the proper stewardship of the public fisc, or the effective operation of important and sensitive public institutions, and thus would constitute matters of public concern. But we do not think that the public has a substantial interest in minor payroll discrepancies amongst corrections department staff, an isolated promotion to middle management, an arrest sixteen years prior, or rumors of womanizing. Each of these falls far from the kind of legitimate and understandable concerns that the public would have as to these public institutions and their missions.

12

The form and context of Singer's parody, as much as its content, tend to confirm this conclusion.[3] Devoid as it was of names or specific allegations, the parody was comprehensible only to others who worked at the prison, and only in the most vague manner. Whatever the parody's communicative capacity, moreover, Singer shared it with only five fellow employees before discarding it. He admitted that he had no intention of advancing the matter beyond those five. True, a purely private communication can, if earnestly conveyed, constitute speech "as a citizen . . . commenting upon matters of public concern." See Givhan v. Western Line Consol. Sch. Dist., 439 U.S. 410, 414 (1979) (internal quotation marks omitted). But Singer's parody was hardly calculated to advance an important issue in a meaningful way.

We by no means imply that Singer's concerns are insignificant. We realize that the sorts of practices about which he complained, when engaged in by any employer, may have a profound -- and wrongful -- impact on any employee's life, whether or not he is employed by the government. Nor do we suggest that the defendants' responses were proper or even permissible. Taking the facts from the record, while drawing all reasonable inferences and resolving all ambiguities in favor of

---

[3] When we speak of form, we refer not to Singer's choice of parody -- a highly valued means of expression under the Constitution, see, e.g., Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994); Hustler Magazine, Inc. v. Falwell, 485 U.S. 46 (1988) -- but to his execution of it.

13

the plaintiffs, as we must, there is much about the defendants' alleged behavior in the workplace that warrants criticism. And we acknowledge that there is no little irony in the fact that Singer's claim suffers because he did not make more serious allegations or circulate his criticism publicly, to the likely greater injury of the defendants. More serious charges against the defendants, deliberately aimed at a broad public audience, and that presumably would have seriously endangered the defendants and their reputations, might well have been protected by means of a section 1983 lawsuit, while the parody's brand of mere office gossip was not.

But under the circumstances of this case, the defendants' alleged overreaction to the parody is not a constitutional issue for this Court to address. It is a concern of the labor laws and of the legislative and executive branches of the State and of Ulster County. We, as a federal court, are under instructions not to "constitutionalize the employee grievance," Connick, 461 U.S. at 154, lest we "compromise the proper functioning of government offices," Roe, 543 U.S. at 82. We thus conclude that Singer did not speak "as a citizen upon matters of public concern." Singh v. City of New York, 524 F.3d 361, 372 (2d Cir. 2008) (internal quotation marks omitted).

## B. The Expressive Association

The conclusion that Singer's parody was not speech "as a citizen upon matters of public concern" also disposes of Decker and Nollner's expressive association claims. "[A] public employee bringing a First Amendment freedom of association claim must persuade a court that the associational conduct at issue touches on a matter of public concern." Cobb v. Pozzi, 363 F.3d 89, 102 (2d Cir. 2004). Decker and Nollner's associational conduct is limited to involvement, or perceived involvement,[4] in the creation and circulation of Singer's parody. Having determined that Singer's creation and largely involuntary dissemination of the parody is not entitled to First Amendment

---

[4] There is no suggestion in the record that Decker and Nollner actually were involved in the creation or circulation of Singer's parody. We have been pointed to no authority binding on us -- nor found any ourselves -- as to whether a public employee may sustain a First Amendment claim when he or she did not in fact engage in the protected activity for which his or her employer, however mistakenly, retaliated. Since the result is the same in any event, we assume without deciding that Decker and Nollner can indeed base their claim on alleged retaliation for conduct in which the defendants only mistakenly thought Decker and Nollner had engaged, namely their involvement in, or presence during, the creation of the parody. We note, however, that decisions from other Circuits require that, in the First Amendment context, the plaintiff actually engaged, or at least intended to engage, in the protected conduct for which he or she suffered retaliation. See Wasson v. Sonoma County Junior College, 203 F.3d 659, 662-63 (9th Cir. 2000); Jones v. Collins, 132 F.3d 1048, 1053-54 (5th Cir. 1998); Fogarty v. Boles, 121 F.3d 886, 889-91 (3d Cir. 1997); Barkoo v. Melby, 901 F.2d 613, 619 (7th Cir. 1990).

15

protection in this precise context,[5] and finding nothing in the record entitling Decker and Nollner's association with Singer and the parody to greater solicitude, we are compelled to affirm the district court's grant of summary judgment against their expressive association claims.

### C. The Lawsuit

The plaintiffs' final claim is that some of the defendants violated their First Amendment rights by retaliating against them for their filing of the initial complaint in this action.  Whether their claim is based on the filing of the complaint itself (and thus brought under the First Amendment's Petition Clause) or is instead based on speech contained within this proceeding (and thus cognizable under the Free Speech Clause) it is subject to the same public concern test we have been discussing.  See Borough of Duryea v. Guarnieri, 131 S. Ct. 2488, 2501 (2011) ("As under the Speech Clause, whether an employee's petition relates to a matter of public concern will depend on 'the content, form, and context of [the petition], as revealed by the whole record.'" (quoting Connick, 461 U.S. at 147-48, and n.7)).

[5]  It might, of course, be protected in many others.  See, e.g., Hustler Magazine, Inc. v. Falwell, 485 U.S. 46 (1988) (claim of intentional infliction of emotional distress); New Times, Inc. v. Isaacks, 146 S.W.3d 144 (Tex. 2004) (libel claim).

16

The plaintiffs argue, as Singer did with respect to his parody, that their lawsuit touches on a matter of public concern because the complaint included allegations of corruption. As explained above, we conclude that the corruption alleged here is not the sort that is of "general interest to the public." And even if it were, the thrust of this lawsuit is not towards remediating this corruption, but towards the "entirely personal" relief of monetary damages for what are, at bottom, allegations of wrongful treatment as employees and wrongful termination. See Ruotolo v. City of New York, 514 F.3d 184, 190 (2d Cir. 2008) (finding lawsuit not on a matter of public concern where plaintiff lodged "essentially personal grievances" and sought relief "for himself alone"); Ezekwo v. N.Y.C. Health & Hosps. Corp., 940 F.2d 775, 781 (2d Cir.) (observing that plaintiff "was not on a mission to protect the public welfare" in finding lawsuit not on a matter of public concern), cert. denied, 502 U.S. 1013 (1991).

In reaching this conclusion, we express no view as to whether, or in what circumstances, a public employer's respect for its employees' First Amendment interests is a matter of public concern. Nor do we express a view about whether a lawsuit seeking redress for a First Amendment violation could itself qualify as a matter of public concern even though the underlying First Amendment claim lacks merit.

17

We need not consider these situations because this case presents none of them. The plaintiffs brought this action not in furtherance of "the principle that debate on public issues should be uninhibited, robust, and wide-open," New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964), but in pursuit of victory in a personal dispute with their supervisors. It does not follow from the fact that the plaintiffs present their action in First Amendment clothes that they are entitled under these circumstances to First Amendment protection. Public employees do not enjoy "a right to transform everyday employment disputes into matters for constitutional litigation in the federal courts," Guarnieri, 131 S. Ct. at 2501; nor, at least in the ordinary case, does retaliation for a plainly unsuccessful attempt at such a transformation itself touch on a matter of public concern solely because the initial suit asserted a First Amendment violation.

* * *

The district court correctly determined that none of the conduct for which the plaintiffs allege they suffered retaliation touched on a matter of public concern, and that the plaintiffs, as public employees, could therefore not sustain First Amendment claims under section 1983 against the defendants.

18

**CONCLUSION**

For the foregoing reasons, the district court's judgment is affirmed.  The parties shall bear their own costs on appeal.

