17-1120-cv
*Gorman v. Rensselaer Cty., et al.*

# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2017
No. 17-1120-cv

JOHN GORMAN,
*Plaintiff-Appellant,*

*v.*

RENSSELAER COUNTY, ANTHONY PATRICELLI, UNDERSHERIFF PATRICK RUSSO,
SHERIFF JACK MAHAR, COUNTY HUMAN RESOURCES MANAGER TOM HENDRY,
COUNTY EXECUTIVE KATHLEEN JIMINO,
*Defendants-Appellees,*

WILLIAM MCINTYRE, PUBLIC SAFETY PSYCHOLOGY PLLC,
*Defendants.*

ARGUED: JANUARY 10, 2018
DECIDED: DECEMBER 6, 2018

Before:        JACOBS, HALL, and DRONEY, *Circuit Judges.*

John Gorman appeals from a judgment of the United States District Court for the Northern District of New York (Kahn, J.) dismissing his complaint on summary judgment.  Gorman brought this action under 42 U.S.C. § 1983, alleging (inter alia) that the defendants (1) retaliated against him in violation of the First Amendment after he filed a report that a fellow sergeant in the Sheriff's

Department had misused a digital repository of criminal justice information, and (2) infringed his right to intimate familial association with his sister. As to the first claim, we conclude that a reasonable officer would not have known that it was clearly established law that Gorman's speech constituted a matter of public concern and the defendants are therefore entitled to qualified immunity. As to the second, we conclude that Gorman failed to allege any facts that would allow a reasonable jury to infer that the defendants intentionally interfered with Gorman's relationship with his sister. Affirmed.

Judge Droney dissents in part and concurs in part in a separate opinion.

STEPHEN BERGSTEIN, Bergstein & Ullrich, LLP, New Paltz, New York, *for Plaintiff-Appellant*.

KEVIN G. MARTIN, Martin & Rayhill, PC, Utica, New York, *for Defendants-Appellees*.

DENNIS JACOBS, *Circuit Judge*:

John Gorman, a former corrections officer, appeals from a judgment of the United States District Court for the Northern District of New York (Kahn, J.) dismissing his 42 U.S.C. § 1983 complaint on summary judgment. Gorman's sister had ended a long relationship with Gorman's fellow officer, Anthony Patricelli, and took up with another man. Bad blood between Gorman and Patricelli ensued, in part because Gorman refused to encourage a reconciliation. Patricelli used a police database to check out the man who was living with Gorman's sister (and Patricelli's son) and saw that the man was a felon. When Gorman reported Patricelli's misuse of the police database, Patricelli was disciplined. Gorman alleges that he was subjected to harassment by Patricelli, the County, and other officials, as retaliation for reporting Patricelli, in violation of Gorman's First Amendment right to speak on a matter of public concern; and that the defendants infringed on Gorman's right to intimate association with his sister by setting one against the other in Patricelli's quest to win back the sister.

2

As to the first claim, the district court held that a reasonable officer would not have known that it was clearly established law that Gorman's speech constituted a matter of public concern, and that the defendants are therefore entitled to qualified immunity. As to the second, the district court held that Gorman failed to allege any facts that would allow a reasonable jury to infer that Patricelli intentionally interfered with Gorman's relationship with his sister. For reasons set out below, we agree. The judgment of the district court is affirmed.

**BACKGROUND**

Gorman is a former corrections officer at the Rensselaer County Sheriff's Department. Anthony Patricelli, a sergeant in the same office, had been in a relationship with Gorman's sister for 27 years until October 8, 2012, when Gorman's brother told their sister that Patricelli had been unfaithful. Later that day, Patricelli called Gorman at work and threatened, "thank your wife, thank your brother, thank you, you'll pay." Gorman alleges that Patricelli followed him around at work with a facility camera system, made threatening gestures when he (repeatedly) passed by Gorman's assignment area, and called Gorman at home proposing to break his jaw. Gorman claims that this continued until June 2013.

Gorman testified that his relationship with his sister deteriorated because Patricelli "would go after her and tell her you gotta control your brother and things like that. When he couldn't get to me, he'd go to her. When he couldn't get to her, he'd go to me and it was back and forth like that."

Gorman filed two criminal complaints against Patricelli, in February and March 2013, and obtained an order of protection against Patricelli from the Schagticoke Town Court. Gorman also filed several workplace harassment complaints.

3

The "eJustice program" is a digital repository for criminal justice information throughout New York, including whether an individual is wanted outside the state. In March 2013, Gorman and his brother informed the auditor of the eJustice program that Patricelli had used the system to run a background check of the man who succeeded Patricelli in a relationship with Gorman's sister, and who had a criminal record. The eJustice auditor advised Gorman and his brother to inform the Division of Criminal Justice Services ("DCJS"), and the DCJS audit led to a referral to the District Attorney. Patricelli was suspended from work and charged with misuse of the eJustice program. Patricelli pleaded guilty to "misuse of a computer," a misdemeanor.

Gorman alleges that he suffered retaliation for reporting Patricelli, including: being ordered to "take deliveries of milk trucks or bread deliveries" during his lunch break, being asked to strip-search inmates, and being somehow hit by a heavy metal door. J. App'x 383–87.

On July 14, 2013, Gorman called in sick, citing exhaustion, depression, and tightness in his chest; the next day, he was admitted to the hospital, where he stayed for three or four days. Gorman never returned to work, and he was advised by letter that his employment would be terminated effective July 15, 2014 due to his one-year absence from work. After a hearing to appeal the termination, Gorman was informed on October 1, 2014 that he was terminated effective that date; he unsuccessfully appealed to the County Civil Service Commission. Gorman v. Rensselaer Cty., 1:14-CV-0434 (LEK/DJS), 2017 WL 1133392, at *4 (N.D.N.Y. Mar. 24, 2017).

Gorman's May 2015 charge of discrimination with the Equal Opportunity Employment Commission ("EEOC") was dismissed as untimely. Id. at *5. On April 16, 2014, Gorman filed this case in the Northern District of New York. Id. The district court granted the defendants' motion for summary judgment in its entirety (without prejudice to filing state-law discrimination claims in state court), prompting this appeal.

4

## DISCUSSION

We review <u>de novo</u> a grant of summary judgment, <u>Wang v. Hearst Corp.</u>, 877 F.3d 69, 72 (2d Cir. 2017), "view[ing] the evidence in the light most favorable to the party opposing summary judgment, . . . draw[ing] all reasonable inferences in favor of that party, and . . . eschew[ing] credibility assessments." <u>Amnesty Am. v. Town of W. Hartford</u>, 361 F.3d 113, 122 (2d Cir. 2004) (internal quotation marks omitted). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Proc. 56.

## I

Under the First Amendment, a public employee who speaks as a citizen on a matter of public concern is protected from the employer's retaliation. <u>Singer v. Ferro</u>, 711 F.3d 334, 339 (2d Cir. 2013). Whether an employee's speech constitutes a matter of public concern is a question of law. <u>Id.</u> "Only if the court concludes that the employee did speak in this manner does it move on to the so-called <u>Pickering</u> balancing, at which stage 'a court . . . balances the interests of the employer in providing effective and efficient public services against the employee's First Amendment right to free expression.'" <u>Id.</u> (quoting <u>Lewis v. Cowen</u>, 165 F.3d 154, 162 (2d Cir. 1999)).

"To constitute speech on a matter of public concern, an employee's expression must 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" <u>Jackler v. Byrne</u>, 658 F.3d 225, 236 (2d Cir. 2011) (quoting <u>Connick v. Myers</u>, 461 U.S. 138, 146 (1983)). But speech that "primarily concerns an issue that is personal in nature and generally related to the speaker's own situation, such as his or her assignments, promotion, or salary, does not address matters of public concern." <u>Id.</u> (internal quotation marks and alteration omitted). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given

5

statement, as revealed by the whole record." Connick, 461 U.S. at 147–48. Relevant considerations include "whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." Lewis, 165 F.3d at 163–64.

Gorman's speech was a report of misconduct by a corrections officer, which can be a matter of public concern. At the same time, the obvious context was infighting about intimate family relationships. That the report can be viewed as embodying both public and private concerns, while not clearly one or the other, provides the focus for our examination of qualified immunity.

"Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Russo v. City of Bridgeport, 479 F.3d 196, 211 (2d Cir. 2007) (internal quotation marks omitted). Clearly established law "do[es] not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Walker v. Schult, 717 F.3d 119, 125–26 (2d Cir. 2013) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)). "Although we generally look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right, the absence of a decision by this Court or the Supreme Court directly addressing the right at issue will not preclude a finding that the law was clearly established so long as preexisting law clearly foreshadows a particular ruling on the issue." Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015) (internal quotation marks and alteration omitted).

Gorman argues that his report about Patricelli's misuse of the eJustice program was a matter of public concern. The district court held that the Defendants are entitled to qualified immunity because the law was not clearly established that Gorman's complaint constituted protected speech. The district

6

court relied on two of our cases, <u>Jackler v. Byrne</u>, 658 F.3d 225 (2d Cir. 2011), and <u>Nagle v. Marron</u>, 663 F.3d 100 (2d Cir. 2011).

"Exposure of official misconduct, especially within the police department, is generally of great consequence to the public." <u>Jackler</u>, 658 F.3d at 236 (citation and internal quotation marks omitted). In <u>Jackler</u>, the plaintiff was a probationary police officer who corroborated a civilian complaint of excessive force, and resisted pressure to conceal the misconduct. <u>Id.</u> at 230–31. Observing that the Fourth Amendment prohibits the use of excessive force by police, and that the misconduct at issue implicated "public safety and welfare" and the "preservation of the public fisc," we held that "police malfeasance consisting of the use of excessive force is plainly a matter of public concern." <u>Id.</u> at 236-37.

At the same time, "[n]o authority supports [the] argument that reporting an alleged crime always implicates matters of public concern." <u>Nagle</u>, 663 F.3d at 107. In <u>Nagle</u>, the plaintiff was a special education teacher who informed several individuals that her signature had been forged on an official report. <u>Id.</u> at 103. The forgery was not a matter of public concern because, "even if such conduct were criminal, [it] had no practical significance to the general public." <u>Id.</u> at 107. Furthermore, the forgery did not reveal "an ongoing pattern of conduct or even a particularly important instance of bad judgment" that might implicate public concern. <u>Id.</u> at 108.

Similarly, here, there is no indication that Patricelli or the other defendants were engaged in an ongoing pattern of misconduct that might concern the public. A single incident of official misconduct *may* touch on a matter of public concern, as in <u>Jackler</u>; but <u>Jackler</u> held that an instance of excessive force was a matter of public concern (in part) because it implicated public safety and because *repeated* instances of excessive force can result in municipal liability, which affects the public fisc. 658 F.3d at 236 ("Deliberate indifference to claims of such civil rights violations--tantamount to a custom or policy sufficient to support municipal liability under § 19--may be inferred from a municipality's lack of

appropriate response to repeated complaints of such violations."). Unlike the misconduct in Jackler, Patricelli's isolated use of a computer program for a private purpose implicated neither public safety nor the use of taxpayers' money. Even if (implausibly) Patricelli's misuse of the eJustice program is characterized as more serious than forgery (at issue in Nagle), that misuse was not remotely as egregious as the misconduct reported in Jackler.

Here, the district court granted defendants qualified immunity on summary judgment based on the "context" of Gorman's statement "as revealed by the whole record." Connick, 461 U.S. at 147–48. We agree: the context was a volatile, intra-family feud that embroiled Patricelli and the Gorman siblings. That context indicates that the speech "primarily concern[ed] an issue that [was] personal in nature," Jackler, 658 F.3d at 236, "was calculated to redress [Gorman's] personal grievances" against Patricelli, and had no "broader public purpose," Lewis, 165 F.3d at 163–64. It was score-settling, and had small practical significance to the public.

Accordingly, at the time of the alleged violations, a reasonable officer would not have known that it was clearly established law that Gorman's speech constituted a matter of public concern. The Defendants are therefore entitled to qualified immunity on Gorman's First Amendment retaliation claim.

**II**

The Fourteenth Amendment guarantees a substantive right under the Due Process Clause to intimate familial association, including between siblings. Patel v. Searles, 305 F.3d 130, 135–36 (2d Cir. 2002) (citing Roberts v. U.S. Jaycees, 468 U.S. 609, 618–19 (1984)). A claim for infringement of the right to familial association requires conduct "'so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection.'" Anthony v. City of New York, 339 F.3d 129, 143 (2d Cir. 2003) (quoting Tenenbaum v. Williams, 193 F.3d 581, 600 (2d Cir. 1999)).

8

The district court held that Gorman failed to allege any facts that would allow a reasonable jury to infer that Patricelli *intentionally* interfered with Gorman's relationship with his sister. Several circuit courts (and district courts within this Circuit) have held that intimate association claims are limited to situations in which the state actor intentionally targets the familial relationship. See Russ v. Watts, 414 F.3d 783, 787–88 (7th Cir. 2005) (collecting cases); Phillips v. Cty. of Orange, 894 F. Supp. 2d 345, 380 n.32 (S.D.N.Y. 2012) (collecting cases); but see Rentz v. Spokane Cty., 438 F. Supp. 2d 1252, 1263–65 (E.D. Wash. 2006) (tracing the Ninth Circuit rule that the Fourteenth Amendment protects "parents in the companionship and society of their adult children, even when the deprivation of that interest is incidental to the state action"). However, this Circuit has never squarely decided this issue.[1]

Relying on Adler v. Pataki, 185 F.3d 35 (2d Cir. 1999), Gorman argues that he is not required to show that Patricelli intended to interfere with Gorman's relationship with his sister. But Adler was not a Fourteenth Amendment claim: Adler concerned a familial association claim brought pursuant to the *First* Amendment, alleging that he was retaliated against because his wife filed an employment discrimination lawsuit against the State of New York. In that context, we ruled that "simple vindictiveness against the plaintiff on account of his wife's lawsuit" was sufficient motive to sustain a familial association claim. Id. at 45. Adler thus establishes that First Amendment associational rights protect against state intrusion into a family relationship intended to retaliate for a family member's exercise of his or her First Amendment rights. Here, however, there is no allegation that Gorman's sister (unlike the plaintiff's wife in Adler) at any time exercised her right to free speech under the First Amendment; so

---

[1] In Patel v. Searles, we observed that "this Circuit has never held that a challenged action must be directed at a protected relationship for it to infringe on the right to intimate association." 305 F.3d at 137. However, we declined to decide this point of law because the plaintiff had "alleged facts sufficient to prove that the officers' conduct *was* intentionally directed at his family." Id. (emphasis in original).

Gorman's claim does not implicate the First Amendment retaliation concerns in Adler. Accordingly, we consider the intent requirement within the framework of the Due Process Clause of the Fourteenth Amendment.

"Historically, th[e] guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property." Daniels v. Williams, 474 U.S. 327, 331 (1986) (collecting cases) (emphasis in original). "[T]he Supreme Court has never extended the constitutionally protected liberty interest incorporated by the Fourteenth Amendment due process clause to encompass deprivations resulting from governmental actions affecting the family only incidentally . . . ." Shaw v. Stroud, 13 F.3d 791, 805 (4th Cir. 1994). Based on the Supreme Court's directive that only deliberate conduct implicates due process, we join the consensus view of the circuit courts: a claim under the Due Process Clause for infringement of the right to familial associations requires the allegation that state action was specifically intended to interfere with the family relationship.

Gorman's second § 1983 claim is that Patricelli intentionally interfered with his relationship with his sister by repeatedly going "back and forth" between them and "tell[ing] her you gotta control your brother and things like that." Br. of Appellant 5, 36. We conclude that any impairment of the sibling relationship was at best the indirect and incidental result of Patricelli's conduct. Accordingly, Gorman has failed to identify any evidence that would allow a reasonable jury to infer that Patricelli infringed on Gorman's right to intimate associations under the Due Process Clause.

## CONCLUSION

The judgment of the district court is **AFFIRMED**.

DRONEY, *Circuit Judge*, dissenting in part and concurring in part:

The majority concludes that Sergeant Patricelli and the other officers are entitled to qualified immunity for retaliating against Gorman after Gorman reported Patricelli's misuse of a confidential law enforcement database. Patricelli's misuse of that database violated not only the New York Division of Criminal Justice Services' written policies, but also New York criminal laws. Officer Gorman reported Patricelli's misconduct to the state authorities responsible for the database and, based on their recommendation, then to the state prosecutor. The retaliation and harassment by Patricelli and the other individual defendants that followed included threats and physical abuse of Gorman. Because it was well-established at the time that misuse of such a law enforcement database was of significant public concern, the defendants were not entitled to qualified immunity. I therefore dissent.[1]

This Court has long made clear that exposing official misconduct constitutes speech on a matter of public concern. *See Johnson v. Ganim*, 342 F.3d 105, 112–13 (2d Cir. 2003). Indeed, "evidence implicating a government official in criminal activity goes to the very core of matters of public concern." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 606 (1976) (Brennan, J., concurring). That is especially true where, as here, the reported misconduct involves police officers. As we observed long before Officer Gorman reported Sergeant Patricelli's misuse of the database, "[e]xposure of official misconduct, especially within the police department, is generally of great consequence to the public." *Jackler v. Byrne*, 658 F.3d 225, 236 (2d Cir. 2011) (quoting *Branton v. City of Dallas*, 272 F.3d 730, 740 (5th Cir. 2001)); *see also Moskowitz v. Coscette*, 3 F. App'x 1, 4–5 (2d Cir. 2001) (summary order) (concluding that an officer's speech about "actions by other officers that involved the safety of the public or corruption within the police department" constituted protected speech).[2]

---

[1] I join the majority opinion in concluding that the district court properly granted summary judgment on Gorman's familial association claim under the Fourteenth Amendment.

[2] While "we generally look to Supreme Court and Second Circuit precedent . . . to determine whether the conduct [at issue] violated a clearly established right," *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (internal quotation marks and citations omitted), it is worth noting that our holding that police officers speak on matters of public concern when they report fellow officers appears to be a widely-settled question. *See, e.g., Robinson v. York*, 566 F.3d 817, 822 (9th Cir.

1

The majority acknowledges *Jackler* and that reporting police misconduct is generally a matter of public concern, but it concludes that the misconduct here was not nearly as serious as in *Jackler* because the mere "use of a computer program for a private purpose" did not "implicate[] . . . public safety []or the use of taxpayers' money" and did not constitute a "pattern of misconduct." The majority concludes that the particularly egregious misconduct present in *Jackler* and the circumstances in our more recent decision in *Nagle v. Marron*, 663 F.3d 100 (2d Cir. 2011), would leave officers without advance warning that Gorman spoke on a matter of public concern when he reported Patricelli's illegal use of the eJustice system.

But, unlike in *Nagle*, the undisputed facts show that Patricelli's criminal misconduct was of "practical significance to the general public." *Nagle*, 663 F.3d at 107. The eJustice program was developed by the New York Division of Criminal Justice System to provide only "qualified users" with the ability to obtain warrant "status information for a defendant at any key decision point in the processing of a criminal case," such as during an arraignment, and for other court and law enforcement purposes. *eJusticeNY*, Division of Criminal Justice Services, http://www.criminaljustice.ny.gov/ojis/ejusticeinfo.htm (last visited Oct. 18, 2018).

---

2009) (stating that a police officer's complaint of "misconduct by fellow . . . officers" was "clearly a matter of public concern" (internal quotation marks omitted)); *See v. City of Elyria*, 502 F.3d 484, 493 (6th Cir. 2007) ("Statements exposing possible corruption in a police department are exactly the type of statements that demand strong First Amendment protections."); *Stanley v. City of Dalton*, 219 F.3d 1280, 1288–89 (11th Cir. 2000) (holding that a police officer's speech about chief of police's alleged theft of money from an evidence room was a matter of public concern); *Martinez v. Hooper*, 148 F.3d 856, 859 (7th Cir. 1998) ("[I]t goes without saying that police misconduct is a matter of public concern."); *Brawner v. City of Richardson*, 855 F.2d 187, 192 (5th Cir. 1988) ("The disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department. Because the speech at issue complained of misconduct within the police department, it should be classified as speech addressing a matter of public concern." (footnotes omitted)); *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1988) ("Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials, in terms of content, clearly concerns matters of public import.").

The eJustice system provides the following information to qualified members of law enforcement and court officials:

- Criminal histories and mugshots;
- Out of state criminal history;
- Sex offender registrations;
- "Watch lists" maintained by the FBI, U.S. Treasury Department and U.S. Commerce Department;
- Other "rap sheet responses" for fingerprint-based identity transactions;
- Probation reports; and
- Departments of motor vehicle records.

*Id*.

Because of the sensitive information the system provides, it is no surprise that the policies adopted by New York State for users of the eJustice system require that it may only be used for "official business" and not for "personal activities." These policies provide that the information obtained through the database must be kept confidential, and all users are required to report "any abuse or misuse" of the system. *Acceptable Use Policy for Users of NYeNet Applications*, eJusticeNY Integrated Justice Portal, https://www.ejustice.ny.gov/ (follow Login button) (last visited Oct. 11, 2018).[3]

The substantial consequences for misuse of the eJustice system are demonstrated by the penalties imposed on Patricelli for his misconduct: he was suspended from his law enforcement position for ten months, demoted, and charged with two felonies by the state; he ultimately pleaded guilty to a misdemeanor.

*Nagle*, by contrast, involved a situation of far more limited public effect. We held that a public school teacher was not speaking on a matter of public

---

[3] It is also important to note that Patricelli himself was not permitted to access the eJustice system, and only obtained the search results through asking another officer who had been qualified to obtain the information.

concern when she reported to the local police that her school's vice principal forged her signature on a class observation report to make it appear that she had received the report. 663 F.3d at 103, 107–08. The police subsequently chose not to prosecute the vice principal. *Id.* at 103, 107. Nagle then sued the vice principal and the school's superintendent, contending that the superintendent did not recommend her for tenure in retaliation for reporting the forged signature. *Id.* at 103. It was only in that context that we observed that "[n]o authority supports Nagle's argument that reporting an alleged crime always implicates matters of public concern." *Id.* at 107.

The majority now relies on that last statement in *Nagle* to shield the defendants in this case from responsibility, despite Patricelli's use of the eJustice system to run a check on his former girlfriend's new boyfriend. But *Nagle* is not that broad. We explained in *Nagle* that "even if [the forgery] were criminal," that act "had no practical significance to the general public." *Id.* The misconduct was so removed from "any matter of political, social, or other concern to the community" that it could not constitute a matter of public concern. *Connick v. Meyers*, 461 U.S. 138, 146 (1983). [4]

But police misuse of a law enforcement database, like the eJustice system, undoubtedly has great "practical significance to the public," and any public official would have known that Patricelli's misuse of it for private reasons would be of substantial public concern. *Nagle*, 663 F.3d at 107. After all, when Gorman reported the database misuse to the New York State Division of Criminal Justice Services, the consequences to Patricelli were severe.

It is also obvious to all public officials that reporting an instance of law enforcement database misuse constitutes a matter of public concern. [5] While

---

[4] In reaching the conclusion that the forged signature did not have any significance to the public in *Nagle*, we emphasized that the signature "did not indicate agreement with the document or have any other effect beyond confirming its receipt." *Nagle*, 663 F.3d at 107–08.

[5] Considerable media attention at the time of Patricelli's misconduct concerning police abuse of a central database lends significant support to this view. *See, e.g.*, Sadie Gurman, *Across US, Police Officers Abuse Confidential Databases*, Associated Press, Sept. 28, 2016, https://www.apnews.com/699236946e3140659fff8a2362e16f43; Amy Pavluk, *Law-Enforcer Misuse of Driver Database Soars*, Orlando Sentinel, Jan. 22, 2013, http://articles.orlandosentinel.com/2013-

Patricelli's conduct is perhaps less egregious than the use of excessive force described in *Jackler*, any reasonable official would still understand not to use those confidential databases for improper purposes. There also is little doubt that unlawfully accessing a law enforcement database is a "particularly important instance of bad judgment" that triggers public concern. *Nagle*, 663 F.3d at 108.[6] Moreover, *Jackler* counsels that the "[e]xposure of official misconduct, *especially within the police department*, is generally of great consequence to the public." *Jackler*, 658 F.3d at 236 (citation omitted) (emphasis added).

Finally, insofar as the majority suggests that this case is not a matter of public concern because it concerned a personally motivated dispute, that distinction is also not consistent with our prior decisions. Even if Gorman were motivated by a personal interest, we have held that where a "personal interest primarily motivated the speech," such motivation "does not, on its own, vitiate the status of the speech as one of public concern." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Ed.*, 444 F.3d 158, 166 (2d Cir. 2006). Indeed, while "speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his

---

01-22/news/os-law-enforcement-access-databases-20130119_1_law-enforcement-officers-law-enforcers-misuse#; Angela Cruz, *Lawsuits Allege Law Enforcement Officers Accessed Private Information*, WPTV, Jan. 3, 2013, https://www.wptv.com/news/region-martin-county/lawsuits-allege-law-enforcement-misused-david-system; Peter Jamison, *Clearwater Police Officer Could Face Felony Charge for Misuse of Law Enforcement Database*, Tampa Bay Times, Nov. 29, 2012, http://www.tampabay.com/news/publicsafety/crime/clearwater-police-officer-could-face-felony-charge-for-misuse-of-law/1263744; Kim Zetter, *Cops Trolled Driver's License Database for Pic of Hot Colleague*, Wired, Feb. 23, 2012, https://www.wired.com/2012/02/cop-database-abuse/; Henry J. Gomez, *Cleveland Police Officer Arrested, Charged with Misusing Law Enforcement Database*, Cleveland.com, July 30, 2011, http://blog.cleveland.com/metro/2011/07/cleveland_police_officer_arres_1.html. Considering this attention and our prior precedent, there is no doubt a reasonable official would have known that misusing a database is a matter of public concern.

[6] Indeed, Congress has made it a federal crime for a person to misuse a similar database. In *United States v. Valle*, 807 F.3d 508, 523–24 (2d Cir. 2016), we noted that misuse of the National Crime Information Center Database by an unauthorized individual is a crime under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030. *See also United States v. Rodriguez*, 628 F.3d 1258, 1260–63 (11th Cir. 2010) (affirming conviction under 18 U.S.C. § 1030 of Social Security Administration employee who used Social Security database to discover information about women in whom he had a romantic interest).

employment, does not pertain to a matter of public concern," we have made clear that "it does not follow that a person *motivated by* a personal grievance cannot be speaking on a matter of public concern." *Sousa v. Rosque*, 578 F.3d 164, 174 (2d Cir. 2009) (citation omitted). Rather, "the content, form, and context of a given statement . . . determine whether it addresses a matter of public concern." *Cioffi*, 444 F.3d at 166.

Here, Gorman contacted a state agency, the New York State Division of Criminal Justice Services, to report criminal misuse of a sensitive state law enforcement database. That report in turn led to a district attorney's decision to prosecute Sergeant Patricelli, a lengthy suspension without pay, a demotion, and a guilty plea. And, while it is possible that Gorman might have been motivated by personal reasons, his report touched on a serious public issue: misuse of a confidential law enforcement database. The officials who then retaliated against him would have known that, too.

For the foregoing reasons, I respectfully dissent.